## TOUPS v. MORGAN'S LOUISIANA AND TEXAS RAILROAD AND STEAMSHIP COMPANY

. ——

(March 15, 1926, Opinion and Decree)
(April 12, 1926, Rehearing Refused)

——

*(Syllabus by the Court.)*

1. Louisiana Digest—Automobiles—Par. 8; Railroads—Par. 80.

In a railroad crossing accident caused by collision of an automobile and a train, the burden is upon the plaintiff to affirmatively prove the allegations of negligence charged in the petition.

2. Louisiana Digest—Railroads—Par. 63, 64.

Where it is conclusively shown by a preponderance of evidence that a clear view of an approaching and carefully operated train could be had by both the driver of an automobile and his wife as an occupant thereof, for a distance of more than six hundred feet, while their car, traveling slowly and while under control, was within fifty feet of the track it is negligence barring recovery, for each of the occupants not to have seen and heard the approaching train in time to avoid the accident.

3. Louisiana Digest—Automobiles—Par. 6.

Though it be the general rule of law that the negligence of the driver of an automobile cannot be attributed to one traveling with him, neither occupant of the vehicle can recover when it is

shown that the proximate cause of the accident was the failure of both to have. seen what each of them should have seen.

Appeal from Twenty-fourth Judicial District Court, Parish of Jefferson, Hon. L. Robert Rivarde, Judge.

Action by Mrs. Elda Duplantis Toups, wife of Thomas J. Toups, and Thomas J. Toups against Morgan's Louisiana and Texas Railroad and Steamship Company, for damages. There was judgment for plaintiff and defendant appealed.

Judgment reversed.

McCabe, Schneckenberger and Emile Pomes, of New Orleans, attorneys for plaintiff, appellee.

John E. Fleury, of New Orleans, attorney for defendant, appellant.

BELL, J.    This is a damage suit, arising from a collision with plaintiff's automobile with one of defendant's eastbound freight trains at Marrero, Louisiana. The accident occurred at 4:30 p. m., September 1, 1922, where defendant's tracks intersect or cross the Barataria Highway. At this point, running parallel to defendant's main tracks, and to the north or river side of them, are two other tracks belonging to the Texas & Pacific Railroad Company, as well as a spur track of the latter company.

The only occupants of the automobile were the plaintiffs herein, (husband and wife), who respectively seek recovery for physical injuries, etc., in the amount of $11,615.00 and $50,200.00, or a total claim for damages in the sum of $61,815.00.

The petition sets forth that while the husband was driving his automobile in which his wife was a passenger, he was traveling the Barataria Highway, going south from the Napoleon Avenue ferry, at a speed of from ten to twelve miles an hour; that having his car under control, "he looked to his left for the approach of trains and that upon looking to his right he could not see the approach of trains until he reached the first of the said railroad tracks, owing to the buildings and tank cars on the property of the Texas Oil Company".

It is further alleged that defendant had full knowledge of the existence of the aforesaid buildings and tank cars which obstructed the view of its trains proceeding toward New Orleans. The acts of negligence finally charged against defendant are, first, that its train was running at an excessive rate of speed, between thirty and thirty-five miles an hour, and secondly, that no signal whatever by bell, whistle or otherwise was given to warn plaintiffs of the approaching train.

The defense was a general denial, coupled with an alternative plea of contributory negligence.

There was judgment in favor of the wife for $3,500.00, and in favor of the husband for $1,500.00. Defendant has appealed, and plaintiffs have answered the appeal, praying for an increase of the respective awards to the amounts originally claimed.

It appears from the evidence that the plaintiffs, who reside in Houma, Louisiana, had visited the City of New Orleans after driving from their home in a small Saxon automobile, which they had left on the west side of the river at the Napoleon

Avenue ferry. landing. After attending to the various · commissions which caused them · to ·drive to the city, they returned to their automobile and proceeded from the ferry ·landing out Barataria road toward the several railroad tracks which intersect· the highway at Marrero, Louisiana. ·The· husband was driving the car, but· his ·wife· was seated on his right, as the automobile faced the woodside of the railroad tracks. The husband .testifies that before reaching the first railroad track he· came to a stop, and then slowly proceeded at about from three to four miles an hour across several tracks, and that as he· reached the defendant's track, which was the last one to be crossed, the defendant's freight train came suddenly upon him, but it was too late for him to do anything.· His testimony is, in part, as follows: ·

"Q. After you started to go across the track did you stop for anything else?

"A. No, sir, I·did not until I tried to stop .after seeing the train.

"Q. After you crossed the first track, how far could you see to your right?

"A. After I crossed the first track?

"Q. Yes.

"A. I really don't know.

"Q. Was there anything to obstruct your view to prevent you from seeing up the track? .

"A. Not after I was on the track.

"Q. After you passed the first track?

"A.. After I got on the first track and could look around, I considered I had a clear right of way."

This witness had previously testified that when about one hundred and fifty feet from the first track, he had noticed to his right, that is to say, the direction from which the train was coming, that there was a building and some tank cars, but he admits, on cross-examination, that none of these obstructions prevented his final view of the defendant's track, which was the last one he had to cross, and that all' of· these obstructions were behind him and to the right of him, and he further testified:

"Q. After you crossed the track shown here in the picture, I say, then, that the house must have been behind you, of course; is that correct?

"A. It stands to reason, after I crossed that track; it would naturally throw the house behind me to my right, in the back of me.

"Q. So after you got to that point, was there anything to prevent you from looking up this track to your right?

."A. There was nothing, so far as I was concerned that I could see to stop me from looking; I looked and did not see anything.

"Q. There was no obstruction there, was there?

"A. No more than oil cars.

"Q. But you had crossed this track. I am talking about after you had crossed this track; there was nothing in addition to the oil cars that would prevent you from looking up on an angle toward the M. L. & T. tracks, was there?

"A. No, sir, there was nothing.

"Q. You could see on an angle, couldn't you, in this direction?

"A. Well, I could see, I had eyes to see, I thought I had looked carefully. I don't remember of any obstruction.

"Q. Could you tell us why you didn't see the train?

"A. Because it must have been too far.

"Q. The train was too far away?

"A. It seemed so.

"Q. About how far away?

"A. I don't know, because when I seen the train it was on me.

"Q. About how far could you see; you have nothing the matter with your eyesight, have you?

"A. Positively nothing that I ever knew of.

*  *  *

"Q. And you couldn't say why you

didn't see it, except that you considered that the train was too far away?

"A. That is the only thing; I could consider nothing after the train was right on me and struck me."

The wife testifies, in part, as follows:

"Q. You didn't hear anything at all to indicate that a train was coming?

"A. No, sir, all I seen was a big train coming, and all at once it seemed to jump on us.

"Q. Do you remember that little building on your right, as you stopped at the first track?

"A. Yes, sir, we did stop.

"Q. Did you stop after that?

"A. We were going about three to four miles an hour after that, over the first track.

"Q. You never stopped after that, did you?

"A. I don't remember until the train hit us; I don't remember after that.

"Q. After you proceeded to cross the track, did you look up and down the road to see if a train was coming?

"A. Certainly I did.

"Q. How many times did you look, Mrs. Toups?

"A. I am always watching my way ahead of me.

"Q. Did you see Mr. Toups look up and down, too?

"A. I didn't look at Mr. Toups, I paid my own attention about looking where we were going.

"Q. In other words, you had the same opportunity to look and see as Mr. Toups had?

"A. Certainly.

"Q. And you did look and didn't see any train coming?

"A. I never heard or seen anything at all.

"Q. And you didn't say anything to Mr. Toups at all?

"A. No, sir.

"Q. Until the train and the machine were about to strike, is that right?

"A. Yes, sir.

"Q. When you first saw the train, what was the distance between you and that train?

"A. When I seen the train I seen we were gone.

"Q. The automobile must have been pretty close up to the rail, is that right?

"A. Sure we were, and when we seen it was too late when we seen the train.

"Q. You hadn't seen this train at any time up to the time you hollered to your husband?

"A. The moment I seen it the train was on us, and it hit us at the moment I told him, 'Oh! Look what is coming.' That is all I remember.

"Q. Did you listen to hear if there was any train coming?

"A. Certainly I did.

"Q. When did you listen, Mrs. Toups?

"A. Every track we went over.

"Q. Every track you went over?

"A. Yes, sir.

"Q. To your left and to your right?

"A. Yes, sir.

"Q. You said nothing to your husband?

"A. Nothing whatever.

"Q. You had the same opportunity as Mr. Toups to see from the right or left; in other words, to look and listen; to look to see if a train was coming or to listen if one was coming, as he had, didn't you?

"A. Yes, sir.

"Q. You didn't see this train coming, he didn't see it and you didn't hear it?

"A. When we seen the train we seen it both at the same time."

Taking the testimony of both plaintiffs as above noted to be true, it is conclusive that neither of them, though looking for the approaching train, saw it until the moment of the collision, when it was too late to avoid the accident. Their negligence in this respect must bar recovery unless it can be established—as alleged by them —that their view of the train was obstructed, and that the negligent operation of the train was the direct and proximate cause of the accident. However, both,

plaintiffs admit that all obstructions referred to in their petition were well behind them after they had crossed the first track of the Texas & Pacific Railroad. The accuracy of the blue-print prepared by defendant's Divisional Engineer and made by him only a few days after the accident, has not been challenged in any manner by plaintiffs. This document discloses in detail the exact *locus in quo*, as to tracks, buildings, etc., from the point of collision west of the section house, located some 2647 feet beyond. This plan, as well as the photographs offered by both litigants, establishes beyond controversy that from a point just beyond the intersection of the first Texas & Pacific track with the Barataria Highway, and within fifty feet north of the point of accident, a straightaway view for at least 637 feet could be had along defendant's track in a westerly direction from whence the train was approaching.

We find nothing in the evidence to justify plaintiffs' contention that surrounding buildings, tank cars or other obstructions prevented a view of the approaching train. A small "pagoda" station belonging to the Texas & Pacific railroad is shown to have been on the right or west side of the Barataria Highway, and about nine feet north of the first Texas & Pacific track. This building, as indicated by its name, was only partially enclosed, boards on each side running from its foundation to within four or five feet of the roof. But even if the construction of this building, in any manner, tended to obscure the view of trains approaching the highway from the west, it could not have obstructed the view of either plaintiffs in this case, for the reason that their automobile had passed beyond it in a southerly direction, causing it to be behind plaintiffs' car when they had gotten to within fifty feet of defendant's tracks. The evidence shows

that both plaintiffs were quite familiar with the surroundings, the tracks and buildings at the place of the accident.

· Those witnesses for plaintiffs testify that they were seated in an automobile parked on the upper or right side of the Barataria road, about 150 feet from the railroad crossing and toward the ferry landing; that they noticed plaintiffs' car as it was going toward the tracks, and that it was moving at a very slow rate of speed. All of those witnesses agree in their testimony as to the speed of the train, which they estimated to have been 30 or 35 miles an hour; each of them swear that they heard no whistle or bell, and for this reason are satisfied that no signal of the approaching train was given. One of the witnesses seated in the parked car was talking to the other two occupants, who were man and wife. He swears that he never saw plaintiffs' car stop after it had passed him, and that the "switch" (?) engine striking the car was what attracted his attention. This same witness says he saw the fireman of the engine with his back turned to the crossing, and apparently talking to someone, and that the train came through without any warning. He is positive in his testimony that the fireman was not even looking at the crossing, and yet, in the next breath, he admits, on cross-examination, that he could not see the fireman until after he had passed the crossing and until after the accident. Again, this witness testifies, although engaged in business which daily kept him in close proximity to the scene of the accident, that he could not remember whether there was ever any cross-arm signs at the railroad crossing, but that he noticed them being painted the day after the accident. The Divisional Engineer, whose duty was to supervise and direct the upkeep of defendant's property in this vicinity, positively swears that

these signs were all up at the time of the accident, and that none were painted until late in the fall.

The wife of the owner of the parked car testifies that she is sure there were no cross-arm signs, such as appear in photographs offered. She and her husband, though both were engaged in conversation with each other, and with the friend, say that no warning by bell or whistle was sounded. Each of them estimate the speed of the train at from 30 to 35 miles an hour, though their testimony shows clearly that neither of them saw the train until the moment of the impact, and then only as it crossed the highway immediately in front of them, the highway being from 35 to 40 feet wide.

The narrative of the accident, as gathered from the testimony of the entire crew operating defendant's train, is given by the engineer, fireman, two brakemen, the conductor and the flagman. The train in question was a freight train, consisting of the engine, tender, caboose, and forty-four freight cars, all but eight of the cars being loaded. The train was running as an "extra" local, that is, not on any designated schedule, and was traveling from Morgan City to Algiers, Louisiana. All of the crew testify that the train was not going over fifteen miles an hour at the time of the accident; that about a mile west of Marrero station, the engine blew a station signal, which is one long whistle, and that thereafter, until reaching the highway crossing, four other signals for intermediate crossings were also blown, the latter signals consisting of two long, followed immediately by two short whistles. That the last of the road crossing signals was given at about five hundred to eight hundred feet west of the highway. All of these signals were heard by all of

the crew, and both the engineer and the fireman swear that the automatic bell, operated from the cab of the engine, was continuously ringing from a point fully two thousand feet west of the highway and up to the moment of the collision. The fireman who was on that side of the engine from which plaintiffs approached the crossing testifies that he first saw the automobile when his engine was about one hundred feet west of the Barataria Highway, and that the car was about one hundred feet from the track, moving apparently at a speed of from twelve to fifteen miles per hour; that the automobile at the next moment ran not onto the track but into the side of the engine, hitting the end of the engine bumper or crossbeam, and that he yelled to his engineer who applied all brakes and brought the train to a stop some five hundred feet from the point of collision. Several of the crew testified that upon examining the engine after the accident they found the end of the bumper scarred on the side from which the car had approached. From all the evidence before us, we are convinced that the automobile collided with or bumped into the engine, never getting beyond or upon the rails of the track, and that every opportunity or chance to avoid the accident was with the plaintiffs rather than the defendant. All of the train crew, at the moment of the accident, appear to have been at their proper stations, observing due care in the operation of the train, which we find was not traveling at an excessive speed nor violating any local, municipal or company rule regarding speed.

We do not indorse the views of the trial judge, as expressed in his opinion or reasons for judgment, to the effect that little weight can be given to the uniform testimony of defendant's employees; the evi-

dence shows that all of the crew had been employed by defendant for many years, none of them less than ten years, and several of them for twenty-five or thirty years. It cannot be assumed that employees doing service for such a period of time could be men willing to violate the sanctity of an oath. The speed of the train could not have been greater than what the crew stated it to be, for we find that the train was brought to a stop within five hundred feet after the collision. This would indicate, considering the average length of a freight car to be forty feet, as shown by the evidence, that the train was stopped in a distance less than a third of its length, which could hardly have been possible had the train been going at an excessive rate of speed. But had the employees of the company been in any manner at fault, as we are unable to conclude, it is evident beyond discussion that each of the plaintiffs—admittedly in possession of all their faculties—were fully warned of possible dangers incident to their crossing several railroad tracks prior to reaching the defendant's track. We are convinced that they were also able to see while fifty feet from defendant's track any train approaching thereon within six hundred or more feet from the point at which they were traveling.

The law applicable to circumstances and facts such as are presented in the instant case, has been fully noted by this court in Gibbons vs. New Orleans Terminal Company, et al., 1 La. App. 371. The Supreme Court, in affirming this decision, said:

"The jurisprudence of this State is uniform to the effect that a pedestrian or a driver of a vehicle upon approaching railway tracks and public railway crossings must, at his peril, stop, look and listen before proceeding on the track or to make the crossing, and if he does not do so he is guilty of contributing to any injury which he may suffer, and cannot recover therefor." Gibbons vs. New Orleans Terminal Co., 159 La. 347, 105 South. 367.

It is contended on behalf of the wife, the other plaintiff in this case, that the husband's negligence in operating the automobile cannot be attributed to her as an occupant of the vehicle. This doctrine, under facts justifying its application, has been frequently though not uniformly maintained. It was so held by the Supreme Court in Churchill vs. Texas & Pacific Railway Co., 151 La. 726, 92 South. 314. The facts in that case were, in many respects, similar to those now under consideration. In the cited case, however, the court applied the rule upon two findings of fact which are not present in the instant case. The car, in the Churchill case, was being driven at from twelve to fifteen miles an hour (not three or four teen miles an hour (not three to four plaintiffs); its speed was accelerated when the driver suddenly discovered the rapid approach of the train, which was traveling at twenty-five to thirty miles an hour. The other uccupant of the car had little or no opportunity to warn the driver. There were no series of tracks to be crossed, nor were the occupants of the car given the several and timely opportunities to look and listen for the approaching train, as were afforded plaintiffs in the present case. The court finally concluded—as we are unable to do in the present case—that the train in the Churchill case was negligently operated. On this point, the court said:

"However, as to the giving of the warning of its approach, we conclude, without finding it necessary to review the voluminous record on the point, that the evidence clearly preponderates in favor of the contention of the plaintiff, that is, that[4]

the signals, ringing the bell and blowing the whistle, were not given, as required by the circumstances of this case, and that defendant was guilty of negligence in this respect."

Considering the record admissions of both plaintiffs, as shown by their own testimony heretofore quoted, we are compelled to conclude that each of them were recklessly disregardful of the approaching train, and that their negligence in this respect precludes recovery as to either of them.

Nobel vs. Chicago, Milwaukee & St. Paul Railway Co., 298 Fed. 381.

Barksdale-Administrator, vs. Southern Railway Company of Kentucky, 261 S. W. 656.

Bradley vs. Mo. Pac. R. R. Co., 288 Fed. 484.

Anderson vs. Davis, Director General, 251 S. W. 86.

We are of the opinion, for the reasons and upon the authorities herein noted, that the judgment of the trial court is erroneous.

It is therefore ordered, that the judgment appealed from be reversed and set aside, and it is now ordered that there be judgment for defendant, the Morgan's Louisiana and Texas Railway and Steamship Company, rejecting plaintiff's demands, at their cost in both courts.