BLAKE
v.
JEFFERSON-ST. CHARLES TRANSFER CO. ET AL.

---

(November 14, 1927. Opinion and Decree.)
(December 12, 1927. Rehearing Refused.)
(January 20, 1928. Writ of Certiorari and Review denied by Supreme Court.)

---

(*Syllabus by the Court.*)

1. Louisiana Digest—Appeal—Par. 625.
When there is no manifest error in the judgment of the lower court on a question of fact, it will be affirmed.

2. Louisiana Digest—Automobiles—Par. 6a; Master and Servant—Par. 162, 166.
When the president and general manager of a transfer company, who had been using an automobile of the company for his own pleasure the night before, injures a pedestrian while driving the automobile to the office and garage of the company from his residence, where he had garaged the car for the remaining hours of the night after returning from his pleasure trip, the transfer company is not liable.

3. Louisiana Digest—Automobiles—Par. 9; —Death by Wrongful Act—Par. 17, 25.
An award of nine thousand dollars to a major son and daughter as damages for the suffering and consequent death a month later of the father, a stove repairer aged sixty-three years, earning Twenty-five and 35-100 Dollars per week will be reduced to seven thousand dollars where the plaintiffs were not dependent upon deceased.

Appeal from Civil District Court, Div. "A." Hon. H. C. Cage, Judge.

Action by August J. Blake et al. against Jefferson-St. Charles Transfer Co., Inc., et. al.

There was judgment for plaintiff and plaintiff and defendant Simon Hubig Co. appealed.

Judgment amended and affirmed.

Benjamin W. Kernan, and M. A. Woodruff, of New Orleans, attorneys for plaintiff, appellant.

Gordon Boswell, of New Orleans, attorney for Simon Hubig Co., appellant.

P. M. Milner, of New Orleans, attorney for Maryland Casualty Co.

Prowell, McBride & Ray, of New Orleans, attorneys for Jefferson-St. Charles Transfer Co. and Cyril O. Rousseau, Jr., defendant, appellee.

JONES, J. Plaintiffs, the major son and daughter of James P. Blake, bring suit against defendants for Thirty-eight thousand ($38,000.00) Dollars damages, for the

fatal injuries sustained by their father on March 23, 1925, at the corner of Poydras and Carondelet Streets. The items of damage are:

For the destruction of the earning capacity of their father ___$13,000.00
For his pain and suffering _____ 10,000.00
For his anxiety during his illness concerning his condition _____ 5,000.00
For the damages plaintiffs sustained by his death_____ 10,000.00
                                                    ———————
                                                    $38,000.00

The suit is against Jefferson-St. Charles Transfer Co., Inc., through Cyril O. Rousseau, Receiver of Jefferson-St. Charles Transfer Co., Inc., Maryland Casualty Co., Simon Hubig Co., Inc., and Cyril O. Rousseau, individually, and is based on the negligent operation by Cyril O. Rousseau, as president and agent of Jefferson-St. Charles Transfer Co., Inc., of the Hudson car and by the employee of Simon Hubig Co., Inc., of a Ford truck belonging to Simon Hubig Co., Inc. The Maryland Casualty Co. is joined as defendant as insurer of the Jefferson-St. Charles Transfer Co., Inc., and is brought into the suit under the provisions of Act No. 253 of 1918, the Jefferson-St. Charles Transfer Co., Inc., being insolvent, and Cyril O. Rousseau, individually, is made defendant as the operator of the vehicle owned by Jefferson-St. Charles Transfer Co., Inc.

The negligence charged is that Rousseau drove the automobile of the Jefferson-St. Charles Transfer Co., Inc., down Carondelet Street at a dangerous rate of speed when it was wet and slippery, crossed Poydras Street, a busy thoroughfare, though he saw the truck of the Hubig Company had started across Carondelet Street; that the driver of the Hubig Company truck started to drive across Carondelet Street either without looking or without heeding what he saw; if he did look,

and negligently attempted to cross in front of the Hudson which was coming on a slippery street at a fast rate, that both drivers violated the provisions of the traffic ordinance, and, as a result of the combined negligence of the two drivers, a collision resulted, and the Hudson automobile ran upon the sidewalk and crushed plaintiffs' father against an iron post on the sidewalk of the lake side of Carondelet Street and Canal Street side of Poydras Street.

Hubig Company filed exceptions of no cause of action and of misjoinder of parties.

Maryland Casualty Company filed exceptions that the petition disclosed no legal cause of action and that Act No. 253 of 1918 was unconstitutional.

Rousseau, Receiver of Jefferson-St. Charles Transfer Co., Inc., filed exceptions of vagueness and no cause of action.

The exceptions were heard before Judge Skinner and overruled. After issue was joined, the case was transferred to Judge Cage for trial and the exceptions were again raised and argued at length and again overruled.

The Simon Hubig Pie Company, Inc., urges here earnestly its exception of no cause of action.

This exception is based upon the allegation in the petition that its driver had started across Carondelet Street and that the driver of the Hudson car saw the Ford truck "in ample time to have stopped and avoided the collision," but made no effort to stop. To sustain this contention, Hubig's able attorney quotes the following words of this Court in Hirsh vs. Ashford, 5 La. App. 290:

"Where two automobiles approach each at a right angle on intersecting streets and one of them enters the intersection some time before the other, it is entitled to proceed, notwithstanding that the other car is traveling on a street giving it the right-of-way over the one from which the car first entering the intersection emerged."

In that case no third party was concerned. It was a question solely between the two colliding cars, as to which was negligent and the court found from the evidence, that plaintiff during a heavy rain storm, coming at the rate of fifteen to eighteen miles per hour from the cemetery on Canal Street ran into defendant at Scott Street when he was nearly over the neutral ground.

In the case of Shields vs. Johnson & Son, et als., 132 La. 773, 61 So. 787, where plaintiff, a passenger in a taxicab of defendant Johnson was injured by a car of the New Orleans Railway & Light, sued both as joint tort feasors and exceptions of no cause of action and misjoinder were filed by Johnson. The Supreme Court held:

"The doctrine of 'The last clear chance' cannot be invoked by joint tort-feasors against one another. It has been applied only in those cases where the injured party has been negligent in exposing himself to peril; and where such negligence on his part will not be regarded as the proximate cause of the injury if the wrongdoer either became aware of the peril in time to avoid the collision that caused the injury, or might have become aware of it had he exercised reasonable care to ascertain whether a peril which was to be anticipated did in fact exist. 38 Cyc. 456. But the rule has no application even between the injured party and the wrongdoer when the former contributes to it; there, negligence is concurrent at the very time that the accident occurs. The question is one for the jury as to whether, notwithstanding negligence on the part of the person injured in getting into a position of peril, defendant's servants could have avoided the injury with the exercise of reasonable care and diligence, and hence whether or not they were negligent in this respect. 29 Cyc. 530; 36 Cyc. 1631."

In the case of David vs. Bessaret, 8714 Orl. App., this Court, where an innocent bystander was injured by an automobile alleged in petition to have been forced on the sidewalk, "because another car" rushed from across street at full speed into Bourbon Street in front of it in violation of a City Ordinance, overruled an exception of no cause of action filed by the owner of the cross town car.

Here the petition alleges that the driver of the Ford truck proceded across Carondelet Street when he saw or should have seen the Hudson approaching at a fast rate on a slippery street, all in violation of the City Traffic Ordinance.

Furthermore, under the recent decisions of our appellate courts amendments are favored where the "no cause of action" is based on insufficiency of allegation.

See James vs. New Orleans, 151 La. 480, 91 So. 846; Southern Iron & Equipment Company vs. Cardwell Stove Company, 154 La. 109, 97 So. 332; Stone vs. Crescent Encampment Company, Orl. App. Dig. 131; Guera vs. Levy, Tess. Orl. App. 131.

For above reasons we conclude that the lower judges correctly overruled this exception.

Rousseau and Jefferson-St. Charles Transfer Co., Inc., answered denying that the damage claimed resulted from the negligence of either Rousseau or Jefferson-St. Charles Transfer Co., Inc., and placed the blame upon the driver of the auto truck of Hubig Co., Inc. They also set up the defense that at the time of the accident the automobile was not being used in the business of Jefferson-St. Charles

Transfer Co., Inc., but was being used by Rousseau for his own *personal* purposes.

Maryland Casualty Co. answered denying that Rousseau was negligent, and asserting that the driver of the auto truck of Hubig Co., Inc., was solely responsible for the damages claimed by plaintiffs.

It also tendered the defense that Act No. 253 of 1918 was unconstitutional, and, if the Act were constitutional, plaintiffs were entitled to an action against it solely within the terms of its policy, and that the policy covered the Jeferson-St. Charles Transfer Co., Inc., only when the automobile in question was being used for the business of said company. That, at the time of the accident, the automobile was not being used or driven and was not engaged in connection with, or in the business of said company, but was being driven by Rousseau on his own personal business after business hours.

On the issues thus tendered the case was heard by Judge Cage, who found that both Rousseau and the driver of the auto truck of Hubig Co. were negligent and that their combined negligence caused the injuries to and death of plaintiffs' father. Judgment for Nine thousand ($9,000.00) Dollars was rendered against Rousseau and Simon Hubig Co., Inc., in solido, and the demand against Jefferson-St. Charles Transfer Co. and Maryland Casualty Co. was rejected on the ground that the Hudson car was not being used in the business of the company at the time of the accident.

Appeals were prosecuted by Hubig Co. from the judgment against it, and by plaintiffs from the judgment rejecting their demand against Jefferson-St. Charles Transfer Co., Inc., and Maryland Casualty Co.

Plaintiffs have filed here answers to the appeal of Hubig Co., asking that the judgment be increased by the sum of Five thousand ($5,000.00) Dollars, making the award Fourteen thousand ($14,000.00) Dollars.

Rousseau and Maryland Casualty Co. did not appeal nor answer the appeal.

Rousseau did not appeal from the judgment below either individually or as Receiver of the transfer company and the question of his negligence and consequent liability is not before us, but we must decide three questions:

(1) The negligence of the driver of the truck.

(2) Liability of the transfer company and the insurance company.

(3) Quantum of damages.

We will briefly digest the testimony of the four witnesses who saw the accident.

Pizaro, a warehouse laborer swears he had come that morning from the Poydras Market on the uptown side of Poydras Street and was crossing Poydras Street "cat-a-cornered" just before he reached Carondelet; when about fifteen feet from downtown sidewalk of Poydras Street, he saw the collision; Hudson came down Carondelet, struck Ford on back wheel, then whirled around, cut into the post and crushed the old man who was standing by the post; rear end of pie truck had just crossed woods rail of car track; after accident truck was away out in middle of Poydras Street by the jewelry store which is on uptown lake corner, Hudson was going pretty fast, faster than the Ford, but he did not drive an automobile and could not estimate its speed; street was paved and slippery; Hudson was straddling lake rail of street car track and Ford was on downtown side of Poydras; a big stout man was on back seat of Hudson and

driver in front, he was too nervous to help and walked away down Carondelet Street with his grip immediately after the accident; Hudson car was standing on car tracks in Carondelet Street after collision and Rousseau drove the injured man away; he was about to get on the banquette, but the accident happened in front of him when he was twenty-two feet from sidewalk; that he knew nothing about distances; that both cars turned completely around after the accident when both were headed toward the river; he was not looking backward, but he saw the Hudson coming and saw it hit pie truck.

Sherman, car repairer for I. C. Railroad for ten years, swears he was standing with another gentleman on Prytania and Amelia that morning when Rousseau in Hudson picked them up; the other passenger got out at Howard Avenue and St. Charles, but he and Rousseau came on downtown leisurely and just before they reached Poydras, Ford came out at a rapid speed and Rousseau swerved out Poydras toward Baronne to avoid collision, but hit the Ford and jammed it up against the old man and the post; he went on to work; he paid no fare as ride was an accommodation; after the impact, Ford was facing telephone building on uptown lake corner of Poydras and Carondelet, with wheels against curb about fifteen feet from Carondelet street was damp, morning misty and Hudson skidded all around; Ford turned Hudson completely around with auto facing down Carondelet; Hudson was going at moderate speed, was riding in front seat on right side, but had no grip or bundle; Hudson was going eight or ten miles per hour; Hudson was half-way between car track and curb, when we reached Poydras Street; Ford when first seen was about fifteen feet from Carondelet on downtown side of Poydras, when we were five feet in Poydras Street and *we were about the center of Poydras Street, when Ford crossed into Carondelet Street;* Hudson was swerving toward Baronne Street before impact and Ford struck Hudson from the rear, somewhere behind him; Hudson then made a complete turn and Ford a half turn; left fender of Hudson or running board jammed man against the post and this stopped the turning of the car; saw no other cars nearby; was very nervous and left at once; did not know whether Rousseau slowed up or not.

Rousseau, president and general manager and Receiver of Jefferson-St. Charles Transfer Company, testifies as follows: Was driving seven-passenger Hudson touring car downtown that morning from his residence, 3717 Prytania Street, picked up two gentlemen as a courtesy; Hudson was used only for emergency work in his bus and transfer business; was straddling back of town rail and coming ten or twelve miles per hour; could stop at that speed on a dry day in the length of the car, seventeen feet; although it was drizzling that morning and pavement was wet, he had fairly good tires and car would travel on that wet pavement twice the distance it would take to stop on a dry street; saw the Ford about eight or ten feet from Carondelet Street on the downtown river side of Poydras Street, just as Hudson entered Poydras Street; Ford was then coming twenty or twenty-two miles per hour; Ford slowed up when it reached the first car track and then headed toward the downtown woods corner when Hudson was about center of Poydras Street; he might possibly have turned out and avoided the accident, if Hudson had not turned and traveled sideways; that it was his experience in turning a car rapidly on a wet pavement that "the car would have

more tendency to travel sideways than the way you directed it. A car has more power on the ground due to the wheels in the back doing the work"; an instant after Ford headed for the downtown corner it turned as if it intended to go down Carondelet Street; then the Ford skidded and the left rear corner swung around and struck right side of running board of Hudson car near front door where dent is shown in picture; he tried to swerve to the left, but was knocked entirely around upon the sidewalk and Ford was then facing drug store on uptown river corner, his right hand rear curtain was up; Hudson is left hand drive; picked up his friend, Mr. Hodge, and the gentleman who was standing with him, Mr. Sherman; Jefferson-St. Charles Transfer Co. was insolvent at the time; picture marked Receiver No. 2 shows damages done by iron post on rear left running board of Hudson, pictures 1 and 3 of same seven show damage done by impact of Ford on right side of Hudson near the front; accident was caused by skidding of Ford; remembered he put on his brakes lightly, but putting on brakes on a wet pavement always makes car skid; had used the Hudson car the night before for his own pleasure, as his private car was in the repair shop; after he returned from his pleasure trip the night before he left Hudson in his private garage just across the street from his residence, and was driving it back to his place of business at 116 Marais Street when accident happened; regular office and large business garage was downtown, only single garage opposite residence. Hudson was not used the night before or that morning to carry passengers; telephone company could not give him a phone at his office and his residence phone, Uptown 2688, was listed both under the name of Jefferson-St. Charles Transfer Co. and under the name of C. O. Rousseau; no business was trans-

acted at the residence, but the telephone was listed so people would know there was a bus line in New Orleans and his sister would give information about schedules which was "the only thing it was used for," that his busses ran to Houma, Thibodaux and other places and if there were too many passeners for them, the Hudson was pressed into service possibly about once a week; that he was never at home on Sundays or in business hours from 7 A. M., to 7 P. M.; that his men sometimes telephoned him there at night; that Hudson, when not in use for the company, stayed in garage of company at 116 Marais; that he reported accident to Mr. Thomas, representative of Maryland Casualty Co., which had a general liability policy covering injuries to passengers while riding in busses; Hudson was also covered when actually being used for business of the company; damage to top of Hudson was done by rear left corner of the covered Ford truck; that Hudson was in gear but he threw it in neutral afterwards and did not remember whether he put his foot brake on hard or lightly; first thought Ford was going to cross Carondelet and then that he was going to turn down Carondelet and applied brake lightly to give him time to turn down and let the clutch out, thought he was making a wide turn and going down center of Carondelet Street; was not certain whether brake was on or not at time he was struck by Ford; was going downtown very slowly, because his boys did not come to office until 7 A. M., and he had plenty of time as it was then 6.30 A. M.; was not aware that the old rule of ten miles an hour on Carondelet Street from Julia to Poydras Street had been raised; did not know whether he skidded or not; that he had personally driven the Hudson to pick up overflow passengers, but could not have done so that day, as he had dismissed

two of his drivers and was, therefore, scheduled to drive one of the busses; just above the sign in photograph No. 2 (offered by Hubig) a piece of moulding six or eight inches long off the covered Ford truck, which was stuck in the extra tire after the accident had been turned over by him to the insurance man, Mr. Thomas.

Taillon, twenty-eight years old, driver of Ford, having driven autos for twelve years and having driven for Hubig Pie Company three years before this accident without trouble, on that morning parked his car near the curb on lower side of Poydras Street in front of entrance to Griddle Restaurant, went in to get the order and then came out, got the pies from rear of car and delivered them; motor was stopped, but truck had a self-starter; "*got in my truck and started* and as I placed the car in second, I started across *Carondelet and saw this automobile* coming 150 feet up Carondelet and thought I had plenty of time to make it across and when *the rear end of my truck* got to *the last rail* of the back of town track, I was hit by this other car"; left rear wheel and fender of Ford was struck, but could not tell what part of the other car struck it; was going in second gear, low speed, about five or eight miles per hour, when struck, his left rear wheel and fender were injured; it was a half-ton covered truck, with full load. On cross-examination when asked if he had looked to see if there were any automobiles coming down Carondelet Street, after he got in his truck, he answered, "Yes, after I placed my car in second and started to move." Truck was about ten feet long and front when he started was about even with Carondelet property line; after he started, kept looking straight ahead and did not notice Hudson again until he was struck and made no effort to stop or turn; could not say whether a piece of moulding was torn off by accident; did not tell Officer Nolan he was in a hurry, thought Hudson was coming at legal rate when he first saw it 150 feet up Carondelet Street, but could not judge its speed then; after collision thought speed must have been thirty to thirty-five miles per hour; could have stopped in two to four feet if he had looked; when he saw the car 150 feet away, *he dismissed the car from his mind and never thought* of it again; there were no other vehicles about; knew Carondelet was a right-of-way street; identifies statement voluntarily made by him at police station immediately after accident as correct and complete.

In this statement he uses the following words "*and crossing Carondelet* Street noticed a Hudson make automobile, bearing license No. 26119 coming down Carondelet Street, between Poydras and Lafayette Streets, when this Hudson automobile struck left rear end of my truck and fender turning me around."

It will be noted that he says here he saw the Hudson while "crossing Carondelet Street," whereas, he said on the stand he saw the Hudson coming after he placed the car in second and started to move. There is important difference in the two statements.

The traffic ordinance introduced in evidence shows that Carondelet is a one-way, right-of-way street.

The testimony and the photographs introduced in evidence show that the Hudson was damaged on the left running board under the rear door, where it struck the post and on the right running board right under the hinges of the front door, presumably where it was hit by the Ford, also slightly on right side of top; the left rear hard rubber tire of the Ford truck

was knocked half off the rim and the left rear fender was dented and possibly a little piece of the wooden moulding on the upper body of the truck was broken. Neither car was damaged in front.

The evidence shows that Poydras Street is fifty feet wide; Carondelet Street forty feet; the sidewalks twelve feet and the distance from back of town street car rail to wood side Carondelet property line about twelve feet; the collision occurred on the lower side of Poydras just across the wood side rail.

If Hudson was 150 feet above Poydras when Ford entered Carondelet, then Hudson must have gone at least 190 feet while Ford was going 40 feet and if Ford was going five to eight miles per hour, then Hudson must have been going twenty-five to forty, a conclusion which seems to us unjustified by the evidence. Both Sherman and Rousseau say Hudson was going slowly and Taillon admits he could not estimate speed. Had the Hudson struck the Ford head-on while going at such a speed, the Ford would certainly have sustained greater damages. The evidence of Pizaro is too vague and contradictory for probative value.

We think that the injuries to the two cars show that the accident could not have happened as claimed by Taillon and rather tend to support the statement of both Rousseau and Sherman that the Hudson entered the intersection simultaneously with or a little before the Ford. As shown above, the probative value of Taillon's testimony is weakened by the discrepancy in his two statements and we think the statement made at the police station immediately after the accident, that he did not see the Hudson until he was crossing Carondelet, more probable under all the circumstances.

We, therefore, conclude that the decision of this Court in the case of Hirsch vs. Ashford is not applicable, because the facts are different.

We agree with the Judge of the lower court that the driver of the Ford was negligent in violating the traffic ordinance by entering a right-of-way street without looking, listening and heeding oncoming cars, and, therefore the Hubig Co. is solidarily liable with the other negligent defendant, Rousseau.

On this point see the following decisions:

Norwich Union Indemnity Co. vs. Cohen, 1 La. App. 512; Uzzo vs. Torres, 3 La. App. 293; Welsch vs. Standard Oil Co., 3 La. App. 734; Kelly & Son vs. Yellow Cab Co., 5 La. App. 69; McCalmont vs. Sterkx, 5 La. App. 730; Gibbons vs. N. O. Terminal Co., 159 La. 347, 105 So. 367.

On the second point, namely the liability of transfer company and its receiver, the evidences show the following:

(1) Rousseau owns a Cadillac car of his own which he drives. It was in the shop being repaired.

(2) The Hudson car covered in the policy of insurance by rider owned by the Jefferson-St. Charles Transfer Co., Inc., is used only in "emergency cases" where a bus breaks down, etc. It was always stored on Marais Street where the busses were kept.

(3) On the evening of March 23, 1925, Rousseau took out this Hudson car for his personal use and a pleasure trip with his family.

(4) He owned or rented a garage for one car opposite his residence.

(5) On the night in question he drove back to his home with his family and put the car in his garage.

(6) On his way downtown the next morning purely as a courtesy he picked up a friend and a stranger standing with him waiting for a street car. His friend got out at Howard Avenue and the stranger continued down Carondelet Street with Rousseau and was occupying the front seat at time of the accident.

(7) Rousseau had a telephone at his home both in his name and in the name of the transfer company and occasionally used it at night to call up his employees.

Attorney for plaintiff argues that this phone made his residence a second office and that his private use of the car stopped when he reached his house that night and that he was on the business of the company when he began his trip downtown the next morning.

After careful consideration, we concur in the conclusion of the trial Judge forcefully expressed as follows:

"There is, probably, no corporation President in this City who does not, from time to time, use his house telephone to direct some of the affairs of his concern. This cannot have the effect of making his home the 'counting house,' or, 'domicile,' or 'place of business' of his corporation.

"It is again urged that when Rousseau 'gave a lift' to his friend and the stranger, he was carrying passengers for his corporation, and that it mattered not that they were being carried free, nevertheless, the relation of passenger and common carrier existed between these two men and the Transfer Company.

"This proposition I do not consider sound.

"Rousseau had taken the Hudson car the evening before, from the Company's garage, to use for his own pleasure. Having thus used it, it was his duty to return the car to the garage of the corporation on Marais street and this duty was personal to him.

"When this accident occurred he was in the performance of this duty, a duty personally owed by the individual, Rousseau.

"He was driving the car on his own account, for himself, and not for the Company.

"When he took up these two men to 'give them a lift' they thereby, became his guests, and not the 'passengers' of the Transfer Company.

"Had they been injured in the accident they would have had an action against Rousseau, but not against the Transfer Company.

"The corporation was under no obligation to transport Rousseau to and from his home to its office, nor from its office to his home.

"He was, in this respect, like Mr. Bouden, the President of the Whitney Bank.

"If driving from his home to the Bank in his own car he should cause damage, would any one conceive that the Bank was responsible for his tort?

"If, however, Mr. Bouden's car had been out of commission and Mr. Bouden had taken a car belonging to his Bank and used it to drive to his home, and returning had caused damage, would the fact that the car belonged to the Bank make it (the Bank), liable for Mr. Bouden's tort?

"It seems to me that the questions answer themselves.

"I am of opinion that neither the Transfer Company, nor its surety, can be held liable in this case."

In the case of Black vs. Rock Island A. & L. R. Co., 125 La. 101, 51 So. 82, relied upon by plaintiff, where certain employees of defendant company borrowed a locomotive and negligently injured a pedestrian at a street crossing, the operative of the engine was held to have been under the circumstances the agent of the railroad company. In the case of Marullo vs. St. Pasteur, 144 La. 926, 81 So. 403, where an employee, who had borrowed defendant's car for his own purposes, accidentally injured plaintiff's child, the Supreme Court said:

"The president of a mercantile corporation, who lent his automobile to the company's employee for the employee's own purposes, was not liable for damages caused

by the employee, who was a competent driver."

In distinguishing this case from the Black case, Judge Provosty says:

"This case (the Black case) could have a bearing upon the present case only if the borrower of defendant's automobile could be held to have been the agent of defendant on the occasion in question, but nothing of that kind is pretended."

The same distinction is made in Atkins vs. Points, 148 La. 958, 88 So. 231, where the Supreme Court held that an owner renting cars to chauffeurs for their own purposes at a stipulated sum per day was not liable for damages caused by negligence of chauffeur in operating the hired car.

In Glass vs. Wise & McAlpin, 155 La. 481, 99 So. 409, the Supreme Court uses the following language:

· "There was plainly no departure—no temporary turning aside—from the master's business to engage in a matter concerning the chauffeur, and there could be no resumption of the master's business because the errand· had not been completed. The chauffeur left the store with the truck, not to deliver groceries for defendant, but for the sole purpose of going to Turner's for some meat for Volney Mitchell. He made no deliveries and did not purpose to deliver any groceries on the out-going trip. When he got to Turner's and received the meat he started on his return, not to engage in his employer's business, but to complete his own business for Volney Mitchell—to deliver the latter's meat."

See also Rapier vs. Troxclair, 1 La. App. 763.

The fact that the president of a corporation, engaged in selling automobiles, was driving one of its cars to his home after business hours, and collided with a truck, injuring the plaintiff, was not enough to hold the corporation liable therefor.

Miller vs. National Auto Sales Co., 177 Ill. Ap. 367; Power vs. Arnold Eng. Co., 126 N. Y. Supp. 839; Mandle vs. Panama Pacific Int. Expo. Co., 174 Pac. 400; Gewanski vs. Ellsforth, 166 Wis, 250; Berry Law of Automobiles (4th Ed.), p. 1069.

Return by employee toward defendant's garage with automobile, after personal use by employee in attending funeral, held not a resumption of the defendant's business, rendering defendant liable for injury to plaintiff struck by truck while same was being returned.

Fletcher vs. Meredith, 129 Atl. 795.

As to quantum of damages, plaintiffs are the major son and daughter of the deceased, who was sixty-three years old at the time of the accident, was a stove repairer for the N. O. Public Service at a salary of Twenty-five and 38-100 ($25.38) Dollars per week. He was a widower and resided with the plaintiffs, who cherished highly the affectionate and helpful companionship of their father, but they were not dependent upon him to any extent, although he contributed to the support of the household. Unquestionably his sufferings were horrible from March 3rd to April 28th, the day of his death. His leg, which was badly· crushed, had to be amputated at the hospital and he had to undergo another operation and take nourishment by injections in the arm and his remaining foot was terribly swollen.

The trial Judge allowed each of the plaintiffs Two thousand ($2,000.00) Dollars for the loss of companionship and affection and "wages of the father" and each of them Twenty-five hundred ($2,500.00) Dollars for the sufferings of the father and loss of earnings.

ı As the only wages for which plaintiffs can recover are the four and one-half

weeks of his illness, we think the first item too high and we think the amount allowed on this score should be reduced to Three thousand ($3,000.00) Dollars.

In the case of Cusimano vs. Spies, 153 La. 551, 96 So. 118, where the plaintiff suffered a fracture of the skull and was kept in the hospital ten days and was then taken home still suffering, but was able to attend to filing suit in a month's time, the Supreme Court, after holding that the fracture of the skull was one of the most serious injuries which a man could suffer, allowed Three thousand ($3,000.00) Dollars for his suffering, although the evidence on this point was meagre.

Here plaintiff was in the hospital twenty days and the evidence shows his sufferings were great, although anaesthetics and opiates were used.

In the case of Southall vs. Smith, 151 La. 967, 92 So. 402, the Supreme Court awarded total damages of Seventy-five hundred ($7,500.00) Dollars, where plaintiff, a young man with a wife and seven children, earning One hundred and fifty ($150.00) Dollars per month, had to have his leg amputated and remained in the hospital forty-four days and at the time of the trial fifteen months after accident, he was still unable to do any work.

We think the amount allowed by the lower Judge on this score too high and that an award of Four thousand ($4,000.00) Dollars for the suffering of the deceased accords more closely the recent decisions of this Court and the Supreme Court.

Accordingly, the judgment of the lower court will be amended by reducing the amount of the judgment from Nine thousand ($9,000.00) Dollars to Seven thousand ($7,000.00) Dollars and as so amended the judgment is affirmed.

WESTERFIELD, J. I cannot agree with the majority of the Court in absolving the Jefferson-St. Charles Transfer Co. from responsibility and in condemning the Hubig Pie Company. I therefore respectfully dissent.