## JAMES et al. v. J. S. WILLIAMS & SON, Inc.

### No. 4336.

Court of Appeal of Louisiana. Second Circuit.

June 29, 1932.

Rehearing Granted July 14, 1932.

Foster, Hall, Barret & Smith, of Shreveport, for appellants.

Thatcher, Browne, Porteous & Myers and Irion & Switzer, all of Shreveport, for appellee.

DREW, J.

Neita James and William James sued defendant for damages in the sum of $25,465.40, with legal interest thereon until paid. They allege that on February 23, 1931, at about 6 o'clock p. m., Neita James was struck down and seriously injured by a motor-driven ambulance or funeral car owned by the defendant and being operated by an employee of defendant, acting within the scope of his employment.

They allege the accident happened at the intersection of Ford and Pine streets, in the city of Shreveport; that Neita James was walking across Ford street toward the north side of said street, and was within four feet of the north curb when she was struck down by defendant's ambulance, which was going in an easterly direction on its left of the center of Ford street.

The specific acts of negligence alleged are that defendant's car was being operated on the left side of the street at a speed of forty-five miles per hour; that the speed of the car was not reduced at the intersection; and the driver of defendant's car failed to apply the brakes. They also allege violation of city ordinances No. 207 and 110 of the city of Shreveport. They pray for judgment in the sum of $465.40 for William James as expenses incurred for sanitarium bills, doctors' bills and nurses' bills; and for Neita James in the sum of $25,000 for pain and suf-

fering, personal injuries, and permanent injuries.

Defendant denied, paragraph by paragraph, each material allegation of plaintiffs' petition, and, further answering, it alleged that it has no knowledge, and has never had any knowledge, that plaintiff Neita James was injured by any of its agents and employees, and is informed and believes that at the time, and before plaintiff was injured, she was intoxicated and was walking near the center of the street, on a dark night, under circumstances rendering it impossible for the driver of a motor vehicle to see her, and in the alternative pleaded that her acts constituted gross negligence and carelessness, which was the proximate cause of the accident, and that she had the last clear chance to avoid the accident.

The lower court, in a carefully prepared opinion, rejected the demands of plaintiffs, finding that Neita James was struck down by defendant's funeral car, commonly called "dead wagon," but at the time the employee of defendant was not acting in the capacity of agent for the defendant, but was on a mission of his own after his employment for the day had ceased. Plaintiffs have appealed to this court, and seriously contend that the lower court erred in considering the defense of want of authority of its employee, for the reason that defendant waived this defense by setting up defenses inconsistent with a denial of authority, and for the further reason that the defense of want of authority of the driver of the car at the time of the accident was a special defense which was not affirmatively pleaded, and that the objection to testimony on this defense should have been sustained.

Plaintiffs, in article 2 of the petition, alleged the date of the accident, and that Neita James was struck down by a car owned by defendant and being operated by an employee of defendant acting within the scope of his employment. Defendant, in answer, denied this allegation for want of information. In article 6 of plaintiffs' petition they allege that the recklessness of defendant, its driver and employee, was the direct proximate cause of the accident, which allegation is specially denied by defendant. Article 8 of the petition alleged that defendant's employee (the driver of the car) was on a mission of his employer, and in the course of his employer's business at the time of the accident. This article of the petition is specially denied by defendant in answer.

■ It was necessary for plaintiffs to allege, in order to state a cause of action, that defendant's car struck plaintiff, and that the driver of the car was acting at the time within the scope of his employment. It was likewise necessary for defendant to answer these specific allegations. It said in its answer

that it had no knowledge or information that plaintiff was struck by its car, and it could not be held liable if its car did strike plaintiff, for the reason that the car was not being operated at the time by any of its employees or agents authorized at that time to operate any of its cars. The defenses are not inconsistent, and the testimony offered on the last defense was correctly heard. The lower court, in passing on this question on motion for new trial, said:

"Counsel for plaintiff contends that under the authority of Wardlaw v. Harvey & Jones [(La. App.) 138 So. 892, 895], the defendant in the present case waived the question of authority of its employee, and admitted the same when it set up defenses inconsistent with a denial of authority.

"We think the case is authority for holding that, when a defendant denies the authority of the agent and then sets up an affirmative defense, the latter serves as a waiver of the former.

"The defendant denied the authority of the agent, and likewise denied that plaintiff was struck by a car belonging to defendant, neither of which constituted an affirmative defense, and, in our opinion, were not inconsistent. The defendant then set up facts which were the basis of an affirmative defense of contributory negligence and last clear chance, which affirmative defenses were made in the alternative. As facts cannot be pleaded in the alternative but only legal results can be so pleaded, it was necessary for defendant to plead the facts as was done, and it should not be penalized for pleading as the law requires.

"In the cited case it was said:

"'We therefore hold that defendants have admitted the agency of Rosa Robinson in setting up their special defense that the accident was the result of plaintiffs' own negligence, without pleading this in the alternative. It is true that in the latter part of paragraph 6 of defendants' answer they pleaded contributory negligence in the alternative. But the trial judge in his written opinion correctly states: "It is very clear that defendants' plea of contributory negligence is pleaded in the alternative to the plea of negligence on the part of Rosa Robinson, and not to the defense of lack of agency and/or employment first urged by defendants."'

"On this score, there are not enough of the pleadings quoted to tell how the court arrived at that conclusion and we are willing to accept it as a correct conclusion.

"It might be said that the same thing is true in the present case, as defendant does not specifically state that such affirmative plea is made in the alternative to its denial of agency; but on the other hand it does

not specifically limit it to its denial that plaintiff was struck by one of its cars, and we do not feel justified in holding that it was so limited."

There are two issues in this case: (1) Was the plaintiff struck by the "dead wagon" belonging to defendant? and (2) Was the driver of the "dead wagon," at the time of the accident, acting in his capacity as agent of defendant?

█ On the first issue plaintiff offered several eyewitnesses who swore that the car known as the "dead wagon" owned by defendant was the car that struck plaintiff, and that after striking her it failed to stop; that it was traveling at the time at a rate of speed of not less than thirty miles per hour, on its left side of the street, and that when plaintiff was struck she was nearly across the street; that the driver did not sound his horn or give any warning of his approach on the left side of the street. It was gross negligence on the part of the driver of the "dead wagon," and his negligence was the proximate cause of the accident. The lower court, in dealing with this issue of the case, said:

"We have never had any doubt but that plaintiff has fully proven that she was struck and injured by the 'dead wagon' belonging to defendant and driven by Roy Rhodes, and that Roy Rhodes knew he struck her. The falsity of the testimony of Roy Rhodes is fully shown by the fact that he went back to the place immediately afterward, and his reason for going back which is flatly contradicted by Paul Jameson, another witness for defendant.

"We further place no reliance in the testimony of Wm. Barnett. In addition to contradiction of his testimony by other witnesses, his impudent manner on the stand was not at all to his credit.

"J. S. Thomas, another witness for defendant, did not see plaintiff struck and did not pretend to say what kind of car struck her.

"The only other witness for defendant who testified in regard to the accident was Ethel Woods, who claimed to have seen it. She testified that a blue Chevrolet car struck plaintiff; that plaintiff was struck while on the right side of the street; that she did not see the man (Ed Green) when he was struck. The almost undisputed facts in this regard are that Neita James was struck on the left side of the street, and almost immediately (only a matter of seconds) Ed Green was struck on the right side of the street by a Chevrolet car. The only conclusion we can reach as to this witness is that she was either deliberately falsifying or her eyes went back on her that night.

"There are inconsistencies in the testimony of plaintiff's witnesses, it is true, but not sufficient to destroy their testimony."

There is no error in the finding of the lower court on this issue.

█ A determination of the second issue depends upon the following facts: Was the driver of the "dead wagon," at the time of the accident, on a mission for his employer? Was he doing anything in furtherance of his master's business? Did his contract of employment require that he perform the acts, or did the contract of employment contemplate his acts?

It is clear from the testimony that defendant's contract of employment with the driver of the "dead wagon" did not require him to make use of the "dead wagon" to transport other employees to their homes after work hours, and such was not contemplated in the contract of employment. It is also conclusively shown that there was a violation of the rules of the defendant company when the "dead wagon" was used by any employee other than for the business of defendant company. There is a great amount of testimony going to show that one of the employees, namely Jameson, had used the "dead wagon" on many occasions to go to his home for lunch. It is not shown that this was done with the permission or authority of the officers of defendant company. It is not even shown that the "dead wagon" was loaned to the employees for that purpose, if that would be of any help to plaintiff.

The driver of the "dead wagon," on the night of the accident, and one Jameson, were both regular employees of defendant in his undertaking business in the city of Shreveport. About 5:30 p. m., on February 23, 1931, which was time to quit work for the day, Roy Rhodes, driving the "dead wagon," conveyed Jameson to his home, and when returning to the place of business of defendant to leave the "dead wagon" for the night he struck and ran over Neita James, the plaintiff herein. Roy Rhodes was not on a mission for his master, and was not doing anything in furtherance of his master's business at the time of the accident. The testimony is that the "dead wagon" was taken without the consent or permission of defendant. The lower court has correctly stated the case and law applicable in the following language:

"Roy Rhodes, the driver of the car, had taken one Jamieson, another employee, home, and was on his way back to the undertaking establishment to put the car up for the night at the time the accident happened.

"Plaintiff contends that Roy Rhodes, having no purpose of his own, and accompanying Jamieson for the express purpose of bringing back the car, should be held not to have departed from the course of his employment, and in the alternative, if he had so departed, he re-entered same as soon as he started back to the place of business to return the car to the master.

"If it be conceded, for the sake of argument, that Rhodes and Jamieson took the car, without the consent of the master, for the purpose set forth, then we can see no difference whether it was as an accommodation to Jamieson or·for a joy ride on the part of Rhodes; neither was for the benefit of the master. When Rhodes took the car, he did so for the accommodation of Jamieson, and when he did that he made that purpose his own, although he received no direct benefit. And we utterly fail to see where that enters into the question of departure from the course of employment.

"On the other point, counsel says that the law of this state is different from that in some other states, where it has been held that if the servant uses the car for his own purpose, and without the consent of the employer, he does not re-enter his employment until he has returned to his proper place. Reviewing the Louisiana cases on this point, we find:

"Black v. Rock Island Ry. Co., 125 La. 101 [51 So. 82, 83, 26 L. R. A. ·(N. S.) 166]:

" 'There is really no positive testimony in the record as to the purpose of Fausnacht and Earnest in moving the train (as, for convenience, we shall call the engine and car) by which plaintiff was struck out of the depot, but the inference is that it was done merely by way of celebrating the occasion, and, with that view, of running over and exploding certain torpedoes which had been laid on the track, and that apparently was accomplished as the train passed down. When, however, plaintiff was injured, defendant's employees were engaged in taking the train back to the depot, where it belonged, and the basis upon which the learned counsel rest their argument, that defendants cannot be held liable because, when the injury was inflicted upon plaintiff, their employees, to whose negligence it was attributed, were not engaged in the discharge ·of any service to them, or within the scope of their employment, disappears entirely; for, conceding that, in taking the train out of the depot merely for their own amusement, the men whom defendants had placed in charge of it were rendering no service to defendants and were doing nothing that they were employed to do, it can hardly be denied that their duty to defendants as custodians of the property required that it should be returned to the place from which they had taken it.'

"It had previously been stated that these parties had been placed in charge of the train and were therefore the custodians of it, and it seems that the court gave this as the basis for its judgment.

"In Blake v. Transfer Company, 8 La. App. 310, it was held:

" 'When the president and general manager of a transfer company, who had been using an automobile of the company for his own pleasure the night before, injures a pedestrian while driving the automobile to the office and garage of the company from his residence, where he had garaged the car for the remaining hours of the night after returning from his pleasure trip, the transfer company is not liable.'

"In that case the accident happened on the trip back to the garage, and at least for the time being, the driver was the custodian of the car, and the duty rested on him to return it. The only difference we can see between that case and the present one is that the president was not acting within the scope of his employment.

"In Vuillemot v. August J. Claverie & Co., 12 La. App. 236 [125 So. 168,·170], it was said:

" 'The sole question remaining, then, is whether or not the fact that· Cazaubon had access to the truck at all times and had the general consent of the company to use it made the employer of Cazaubon, the owner of the truck, liable for any damage caused by it, whether ·he was operating it for the company, or in his own affairs and for his own pleasure or convenience.

" 'In support of this contention plaintiff cites Black v. Rock Island R. R. Co., 125 La. 101, 51 So. 82, 26 L. R. A. (N. S.) 166, in which our Supreme Court said:

" ' ' 'Where the agents of a railroad company are placed in charge and control of its depot, locomotives, and tracks in a town, with authority to operate the locomotives over the tracks, for switching and other purposes (connected with the business of the company), and with actual power to operate them when they please, and the agents whilst operating them for their amusement across a street of the town negligently injure a citizen, who is legitimately using the street, such agents will be held to be acting, though improperly, within the scope of authority conferred on them, and the company will be held liable for the injury resulting from such action."

" 'If the doctrine announced in the Black Case be applicable to an automobile or a truck, then the owner of a truck or an automobile is liable for any damage caused by it in the hands of any one using it with his consent. That such is not the law of this state has been many times held. Tinker v. Hirst, 162 La. 209, 110 So. 324; Atkins v. Points, 148 La. 958, 88 So. 231.

" 'While it is true that a casual reading ·of the quotation above set forth seems to· indicate that the liability of the defendant was based upon the agency created by the permission to use the locomotive, a reading of the entire decision shows clearly that the liability resulted from the fact that the acceptance by a railroad company of a franchise and the exercise by it of the rights of

eminent domain carry the duty of so operating the railroad property as not, by negligence, to injure the public, and that this duty cannot be evaded or avoided, or shifted, so long as the vehicle which caused the damage was in the hands of persons permitted by the railroad to use it, and even though, at the time of the accident, it was on the track entirely in the interests or for the pleasure of employees, and not in the concerns of the company. It thus appears to us that the reasoning of the Black Case indicates that the court did not intend to hold that an owner of a vehicle is liable in all cases for injuries caused by that vehicle merely because, at the time of the accident causing the injuries, it is being operated by persons who are in the employ of the owner, if at the time of the accident they are not acting within the scope of the employment and are not performing services for their master, the owner of the vehicle.'

"We rather think the Court used the words 'scope of employment' without due regard to its meaning, and its analysis of the Black Case was, perhaps, not entirely correct; yet it shows the trend of the Court.

"In Cusimano v. Spiess Sales Company, 153 La. 551 [96 So. 118], the court affirmed the soundness of the doctrine of the Black Case, and held:

" 'Master's liability for servant's acts does not cease merely because the servant is acting contrary to, or in defiance of, express instructions from the master.

" 'Servant must have abandoned and turned aside completely from the master's business to engage in some purpose wholly his own before the master ceases to be liable for his acts.

" 'Though servant may have turned aside from master's business, master's liability for his acts reattaches as soon as the servant reassumes the master's business.

" 'Though employee engaged in making deliveries turned aside from employer's business for some purpose of his own, where he had fulfilled such purpose and was either continuing deliveries or returning to employer's store, the employer was liable for his negligence.' ·

"Seemingly, this fits the present case exactly, for seemingly 'returning to the store' was the test of re-entry, but that is not what the court intended is shown by the following quotation from the case:

" 'And the authorities hold that, when the servant, having completed the purpose for which he turned aside, is returning to resume his duties, he is, whilst so returning, engaged in the business of his master.'

"The court may be correct as to a mere deviation or turning aside, but to apply it to an entirely independent trip is treading on dangerous ground, and to apply it to a case where the servant had no further duty to perform after he got back is treading on still more dangerous ground.

"To the same effect as the Cusimano Case is that of Glass v. Wise & McAlpin, 155 La. 477 [99 So. 409], and the court makes it plain that it is the return to resume his service that brings about a re-entry.

"The case of Bowles v. McGlasson, 5 La. App. 367, is rather a perplexing one to understand the reasoning of the court. There the driver left the house on a mission for his master; on the way back, he turned aside on a trip of his own; then while on the way back to put the car up, the accident happened. The court merely stated that it considered the Cusimano Case and the Glass Case as binding, and held the master liable. The evidence showed that he had no further duty to perform after he got back. The court did say that it was the driver's duty to return the car to the garage, and we assume it was on this the judgment was based. The driver having taken the car as a servant and it being his duty, as a servant, to return the car, he then re-entered his duties when he started back.

"We have no reason to conclude that the defendant was under any legal or contractual duty to transport Jamieson to his home, and as a corollary to this, we see no reason to conclude that Rhodes was acting in line of duty in driving the car on this particular day whether he was doing this with permission or not. Whether he was on duty or not just prior to leaving does not enter into the case as we see it. In either case there was a departure from his employment when he left on a trip which was not for the master. And the only way he could re-enter that employment when the trip back started was either on the theory that he was the custodian of the car and it was his duty as such to return it to the place where it was ordinarily kept, or that he was returning to the establishment of defendant to resume his duties as an employee. He was not the custodian of the car, as were the employees in the Black Case. He was in charge of the car and it was his duty to return it, but not in the sense of a custodian, and only in the sense that any one else would be, employee or not.

"We are satisfied that he had somewhat regular hours of employment; it may be that he was subject to call even after these regular hours; but there is nothing in the evidence from which we can conclude that he was returning to take up any further duties. It was late in the evening, way after dark, a time when most business establishments are entirely closed, and while an undertaking business never closes entirely, it is not unreasonable to say that a 'handy

man' gets off work after the ordinary work of the day is over.

"In our opinion, to say in this case that Rhodes re-entered the employment of his master when he started on his return trip to put up the car, would be extending the jurisprudence of this state further than the court has ever gone. It is already out of line with most states and we do not feel justified in going any further.

"Having reached the above conclusion makes it unnecessary to discuss the question of whether plaintiff was struck by defendant's car or some other car."

It is therefore ordered, adjudged, and decreed that the judgment of the lower court be affirmed, with costs.