BREAUX, C. J.
This suit was instituted by the widow of the late Mense Taylor, who sued per se and as tutrix of her eight minor children.
They are colored people.
The sum asked is $26,000.
Mense Taylor was killed in a collision of defendant’s train against his wagon.
He lived at some distance in the country. He loaded his wagon with wood and came to Shreveport to sell it. In passing through Wilson’s Alley, in Shreveport, he drove to a crossing. Mense Taylor was thrown to the ground.
This crossing is about three blocks south of the Union Station.
There are six parallel tracks at this crossing.
The hour of the accident was half past 2 o’clock in the afternoon. We judge that it was a dangerous crossing.
An ordinance of the city required that the two railroads using the tracks at this point have a flagman stationed at this point day and night.
At about the time that Taylor, the deceased, arrived at the crossing, a train made up of a locomotive and a baggage or express car passed on the way to a switch which is situated a short distance south of the crossing. The train ran onto the switch, cleared it, and came back on the main track.
The switch is 210 feet from the place of the collision.
The engine, after the switch had been effected, was pushing back the baggage car in the direction of the crossing.
The front part of the baggage car struck the right rear wagon wheel, and threw the wagon some distance. The impact broke the left rear wheel, and threw T'aylor to the ground, inflicting wounds from which he died several days afterward.
1-Ie suffered the pains that the average able-bodied man (about his age) suffers by death occasioned by s.uch a fall.
He was 52 years of age at the time.
There was a gang of colored men working, repairing the track at the crossing. Their foreman, a white man, was present. The colored laborers testified; also the foreman, who was in the employ of the defendant company.
The other employés of the defendant present also testified.
The colored laborers as witnesses sought to locate the wagon, at the time that the driver, Taylor, came down in the direction of the crossing, at about 10 feet from the first track, and they stated that he stopped at that point and waited- until the train had passed, and that as soon as it had passed he put his team in motion and sought to cross the track hastily, but that the train on its return, traveling at great speed, ran onto the wagon while the driver was trying to drive across.
As relates to the place, there is a flagman’s small house within a few feet of the first track, which temporarily obstructed the view, not altogether, however, in the direction from which the train came.
The testimony of witnesses for the plaintiff *771 has it that the train was running, both in going to the switch and in returning, at the rate of 10, 15, and one witness testified 20 miles an hour.
The distance from the place of the collision to the switching point (another subject before us for discussion) has not given rise to any material difference of opinion. We have already stated it is 210 feet.
If the wagon had been standing at the crossing, as stated by plaintiff’s witnesses, just before putting the team in motion, it would have crossed before the engine reached the switch and resumed its return to the crossing.
Now as to the speed of the train:
The testimony of defendant’s witnesses, which we accept as correct on this point, shows that the speed was not over 6 miles an hour. Some of the witnesses for defendant state that it was not over 5 miles an hour.
It was stated that in going to the switch above the train takes a man who throws the switch, and after this has been done he runs back to the train; that this is the usual work in making the switch.
From the testimony, we judge that the wagon, heavily loaded as it was, pulled by two mules, was not traveling over 3 miles an hour.
As the train traveled 210 feet, besides had to stop in order to make the switching, it is evident that, even if it traveled twice as fast as the wagon, it did not make the 210 feet before the wagon could have crossed the 60 feet, which is in excess of the width of the crossing.
On the day of the collision the defendant had no flagman on duty. The night before, the day flagman died. The night flagman remained on duty until 12 o’clock, and left about 2 hours before the collision.
In his testimony, the superintendent of the defendant road stated as to the duty of the flagman that it is to flag the train when approaching, flag people when crossing, to keep the latter off the track, and warn any one of an approaching train.
The testimony also shows that the engineer on the train could not see the wagon as it was approaching the track. He was on the right-hand side of the train, and the man, Taylor, was on the left. The fireman, on the left-hand side of the track, saw the danger (he swore) and gave the alarm to the engineer.
About the same time the lookout at the end of the baggage car also saw the danger and gave the alarm.
The engineer in a moment thereafter, as soon as possible, applied the emergency brakes.
The man on the baggage car, on the lookout, testified that he saw the wagon some 50 feet off, and that the driver’s head was turned in another direction from the train on which he was at the time.
Although the emergency brakes were applied a few moments thereafter, as just stated, they were not equal to the task of stopping the train in time to prevent the collision.
The section foreman, who had charge of the colored laborers at the crossing, testified that he saw the train coming back, and when he saw the wagon the first time it was after the train had been to the switch. He saw the wagon advancing. He was standing at the moment just prior to the accident within 8 feet of the wagon. He testified that he holloed to the driver to look out; “that the train was coming back;” that the “driver had his head turned from him,” and did not seem to notice the holloing at first; the driver looked around, attracted by the holloing of himself and another person; that just then the driver seemed to understand the danger, and commenced to whip up to hurry across; that, had he stopped at that moment, he would have escaped the collision, for," when *773 lie heeded the cry and began whipping the mules, he was not in any danger, as he was •on the first track, 20 feet from the main line on which the train was; but it was then that he began whipping his mules, although there was nothing to prevent him from stopping at that point. He judged that the train must have been about 100 feet away from the crossing at that particular time; that is, just before stepping to the main track. He said that he did all that he could; that “the flagman could not have done more, unless he had taken hold of the driver and held the team” — stopped them. He adds that the coming train was in open view when the attention of the driver was called to it.
Discussion:
As before stated, we do not attach importance to the testimony of those of plaintiff’s witnesses who said that the driver, Taylor, was waiting near the first track, within a few feet (8 or 10), and that after the train had passed going south on its way to the switch he drove on his wagon and team to make the crossing.
If this were true, however slowly the mules moved, even at a slow walk of say 2 miles an hour, they would have passed entirely over the crossing, beyond it, and out •of the range of all danger. The train, going and returning from the switch, had to run 420 feet, and in addition it had to make the switching and change from one track to another. In that time the slowest moving team would surely have gone over less than ■60 feet (the width of the crossing at that point).
We are impressed by the fact, made evident by the weight of the testimony, as we think, that the driver, his wagon, and team were some 50 or 60 feet from the first track at the time that the train left, as before stated, on its way to switch from one track to another, and that when the driver came to the first track the train had already passed. It is probable that he had seen it when it passed. It is also very probable that he did not suspect that it would return immediately. He was a laborer from the country, and knew very little, as we understand, about the movements of cars and of trains.
He drove onto the first track. His mules stepped onto the track.
The turning point of the case is from the time that the mules stepped onto this track. Then it was that the moment of danger arose, and it increased with each foot of the advancing train to the crossing.
The testimony is conflicting as to the distance that the train was from the crossing at that moment; 60 feet according to some of the witnesses, others 100 feet, and other testimony fixes it at 117 feet. The last distance, 117 feet, was arrived at by calculating the distance based upon the testimony of witnesses in regard to the movement of the train and the wagon.
It will be seen, from our point of view, that we do not attach the greatest importance to the distance, although we are of the opinion that the distance was nearer than 100 feet at the moment that the excitement began, brought on by the imminent danger of collision with the rapidly advancing train. It was then there was holloing, it was at that moment that the driver must have lost his nerve, and it was then that he urged his team with his whip. It was the crucial moment.
If we are to believe the testimony of Frederick, the section foreman, the driver was fully warned of the danger.
We will state, as to the train, it stopped speedily as possible after the danger signal had been given. This signal was given by the fireman and by the lookout about the same time.
At the moment of the holloing in his dazed and scared condition, the driver evidently was at a loss what to do.
*775 He had the right to attempt to cross, provided he exercised ordinary care and prudence. At crossings the right between train and driver of vehicles is about equal.
In this instance, even if he did not exercise the coolness that the average man should exercise, placed in the situation in which he was, it was human enough to act as he did.
The failure to have a flagman at the crossing was a continuing negligence. The flagman’s services were needed, we take it, from first to last.
In order to protect human life, the local authorities require the presence of some one to flag both the trains or the drivers of vehicles and others whose business requires them to cross at the point in question.
The emergency would not have arisen, had there been a flagman as required.
This court said in the Lampkin Case, 105 La. 423, 29 South. 954, 83 Am. St. Rep. 245:
“It is dangerous to fail in the performance of a duty, and to urge as a defense, in case of an accident, that the casualty was unavoidable. The proper course is to perform the duty, leaving results to be actually tested by the facts of each special case.”
Starting from that premise, there is a conclusion entirely reasonable, as we think.
Tested by the text of the cited decisions infra and those to which they refer, the defendant’s cause is met at every point with the necessity there was of having a flagman on duty. It has been said:
“To relieve a defendant company, it must appear that the plaintiff understood the warning and that a person of ordinary intelligence would so understand.” Chicago, B. & Q. Railway Co. v. Notzki, 66 Ill. 455.
At the moment Taylor was not in a condition to heed the warning. Besides, the joint warning of two persons standing near may have added to the confusion of the situation.
Again in another decision this rule is laid down substantially: If omission and want of reasonable care are intimately connected with the cause of the injury, liability for damages may exist. Hilz v. Missouri Pac., 101 Mo. 36, 13 S. W. 946.
Our conclusion is the want of reasonable care was intimately connected with the cause of the injury.
The following is a strong case (101 Mo. 36, 13 S. W. 946). It holds that, notwithstanding the contributory negligence of the deceased (he might have taken a safe position, had he been careful), as there was in the negligence of a continuing effect and of a particular character, the defendant was liable.
In other similar eases the engineer had failed to give the proper signals, it was said, “although the party injured may have been careless,” the company is liable. Hinkle v. Richmond, 109 N. C. 472, 13 S. E. 884, 26 Am. St. Rep. 581, in which Randall v. Richmond, 104 N. C. 416, 10 S. E. 691, is reviewed.
The test is, could the defendant have avoided injuring him? Louisville & N. R. R. Co. v. Schuster (Ky.) 7 S. W. 874; Harlan v. St. Louis, 65 Mo. 22.
Tes, it is reasonably certain, if there had been a flagman, the defendant might have avoided the accident.
It must be borne in mind that, in deciding, we take particularly into account the nature of the negligence as bearing upon the right that the public had to be protected at that crossing by the presence of a flagman.
There must be an engineer at the engine, who has charge of the window on the right, a fireman on the left, a lookout at the end of the train on occasions such as this was, and there should be a flagman at the crossing when required. If there is no flagman, then there is necessity for greater precaution on the part of the other servants of the company.
The absence of the flagman greatly enhanced the danger.
If, while in danger, the deceased did that *777 which an ordinarily prudent person would have done, the company is liable.
There were precautions to be taken, in the absence of a flagman, which were not taken, such as moderation in the speed, and sending the lookout when near the approach, to make sure of the way.
We will be brief in referring to the amount.
The deceased doubtless suffered. He lived ■six days. He was industrious, and earned the wages of a laboring man, and cultivated his little farm, and at odd times did special work which fell in his way as a laborer.
For reasons assigned, the judgment of the district court is avoided, annulled, and reversed. It is ordered, adjudged, and decreed that plaintiff have judgment against defendant for the sum of $5,000, distributed as follows; $2,000 for Lou Taylor, the mother, individually, and $3,000 for her minor children — with interest at 5 per cent, from the date that this judgment is handed down in this court, and that defendant pay the costs of both courts.