(105 So. 367)

No. 27107.

## GIBBENS v. NEW ORLEANS TERMINAL CO.

## IN RE GIBBENS.

(June 22, 1925. Rehearing Denied July 13, 1925.)

*(Syllabus by Editorial Staff.)*

1. **Railroads** ⬥330(2)—**Automobile driver crossing tracks held negligent, though gates were open.**

Where railroad had provided gates at street crossing, and where view of train could be had for at least two squares by one within 50 feet of crossing, automobilist who crossed track without stopping, looking, or listening, and was struck by slowly moving train, *held* contributorily negligent as matter of law, notwithstanding gates at crossing had not been closed.

2. **Railroads** ⬥327(1)—**Person held to have seen.**

One is *held* to have seen that which he could have seen and should have seen.

Rogers and St. Paul, JJ., dissenting.

Suit by Will J. Gibbens, Jr., against the New Orleans Terminal Company. Judgment for plaintiff was reversed by the Court of Appeal, and plaintiff applies for writs of certiorari and review. Affirmed.

Scott E. Beer and Henry & Cooper, all of New Orleans, for applicant.

Monroe & Lemann and Walter J. Suthon, Jr., all of New Orleans, for respondent.

THOMPSON, J. This suit grows out of a collision between a Dodge roadster, owned and operated by the plaintiff, and a cut of cars coupled to a locomotive of the defendant, and in charge of the latter's employees.

The demand of plaintiff is two-fold—for personal injuries and for damages to his automobile. There was judgment in plaintiff's favor on both demands, aggregating $2,550. The judgment was reversed by the Court of Appeal, and plaintiff's entire demand rejected. The latter judgment is before us for review.

There is but slight discrepancy in the evidence, and no serious disagreement as to the vital and important facts.

The collision occurred at the station crossing on the intersection of Bienville and Basin streets. The terminal station of defendant is located at this point on the neutral ground of Basin street. The depot, platforms, and train shed extend from Canal street to Conti street. On the river side of Basin street there is an open iron or bar picket fence, which extends from the rear end of the depot, where the train shed be-

gins, to Conti street, where it ends. The railway tracks, four in number, are within this inclosure; the first track on the river side of Basin street is laid within approximately three feet of the iron fence.

The city, in granting the defendant the right to construct its depot and passenger station facilities and to lay its tracks, exacted that the roadway across the neutral ground of Basin street, opposite the entrance of Customhouse street, be closed with gates or doors which should be left open at all times except when trains are entering or departing from said depot, or when trains are standing on said tracks.

Accordingly, at the intersection of Iberville or Customhouse street with Basin street, the defendant erected an iron picket gate similar in design and height to the fence. The gate operates on rollers, and is opened and closed by hand. When the company extended the train shed, platforms, and iron fence down to Conti street a block beyond Bienville street, though not required by ordinance to do so, it placed a similar gate at the intersection of Bienville street with Basin street.

[1] The plaintiff, accompanied by a friend, was going out Bienville street from the river towards the lake in his Dodge roadster. When the car crossed Rampart street a short block from Basin street, the plaintiff observed that the gates of the crossing were open. He also noticed an automobile about a half square ahead of him pass through the gate and across the tracks. As the plaintiff approached the Basin street crossing, he slackened the speed of his car, but did not stop. He looked, he says, up Basin street towards Canal street for right of way traffic coming down Basin street, and, seeing none, he then looked towards Esplanade, and, seeing no train approaching and hearing no signals or bells, put on power and started across Basin street through the open gate.

At that time the train of the defendant, consisting of four passenger coaches, two baggage cars, and a locomotive, was slowly backing into the station on the first or river side track. When the plaintiff got about midway of Basin street he heard some one call out, "Stop!" and he put on his brakes, but it was then too late—the collision was inevitable. As the front wheels of the roadster got on the track the train struck the car and jammed it between the gate posts and the side of the coach.

The evidence establishes that when the plaintiff got within 50 feet of the crossing there was no obstruction of his view from either side of Bienville street, and there was no obstruction of his view down Basin street towards St. Louis street for at least two squares, except the iron fence. This fence is about two-thirds of the height of a passenger coach, and the bars are several inches apart and permit a clear view of an approaching train on the inside of the fence.

[2] There was, therefore, no excuse for the plaintiff not to have observed the train after he got within 50 feet of the crossing, if he had turned his eyes in that direction. The rule of law is that a person is held to have seen that which he could have seen and should have seen.

Upon the platform of the front coach of the train as it was backing in were two employees of defendant. One was handling the "monkey tail" hose, which is a whistle for stopping the train called an air whistle. This was being blown frequently all the way from St. Louis street into the station. When the train reached a point within 10 feet of the crossing, the man on the platform of the incoming coach observed for the first time the plaintiff's car turned towards Canal street with its wheel on the track. He immediately applied the air on the emergency brake and stopped within 30 feet, but after the coach had struck the automobile.

There is no negligence imputed to the defendant or to its employees in the handling or operation of the train. The only negligence charged is the fact that the gate at the crossing was left open at a time when it should have been closed, thereby, as claimed, justifying the plaintiff in assuming that the crossing was clear, and that he could go over in perfect safety in so far as moving trains were concerned.

It was 2:30 o'clock in the afternoon. The day was clear, and the atmospheric conditions normal. The plaintiff did not stop at the crossing. He did not look, and he did not listen, at a time when the proper exercise of the two senses would have been effective, and would have avoided the injury to himself and to his automobile.

The plaintiff was familiar with the situation and surroundings. He had been there before. The location of the station, the numerous railway tracks, and the iron fence which inclosed the tracks were of themselves outstanding signals of danger sufficient to have suggested to the plaintiff the duty and the necessity of looking and listening for an approaching train before going upon the track. He should not have closed his eyes and stopped up his ears as it were and ignored altogether the silent but prominent warnings we have mentioned and accepted the mere fact that the gate was open as a license authorizing him to proceed.

Without observing any precaution whatever and with utter indifference to his own safety and that of his friend he "stepped on the gas," and with accelerated speed heedlessly, blindly, and deafly proceeded across the street, through the open gate, and onto the track of the defendant.

The main facts as we have stated them are substantially as found by the district judge and by the Court of Appeal. The trial judge in his written opinion said:

"I am also satisfied that if the plaintiff had stopped, looked, and listened, with the thought in the back of his head of trains, he would have seen this train approaching him and would not have been injured."

The Court of Appeal, in the course of its opinion, said:

"The trial judge, in an elaborate opinion, found as a fact that the plaintiff did not look or listen, because if he had the accident would not have happened. But he concluded that by leaving the gate open the defendant had tacitly told the plaintiff that there was no danger in passing, and had invited him to pass, and was therefore guilty of negligence.

"We are of the opinion, however, that the plaintiff was guilty primarily of such negligence as precludes him from recovery."

As we agree with the trial judge and the Court of Appeal on the ultimate facts as found by both of said courts, we come to the real question in the case, and that is: Does the fact that a gate at a railroad crossing, known to be dangerous and extrahazardous, which is left open at a time when it is required to be closed against traffic, relieve one intending to cross the track from the charge of contributory negligence, when by looking and listening, or by the exercise of ordinary care and prudence, he could have seen or heard an approaching train in time to have avoided a collision with such train?

Or, to state it differently: Is an open gate, under the circumstances stated, to be accepted by one intending to effect a crossing as an invitation to proceed, or an assurance by the railroad company that he can proceed across the track with perfect safety?

It must be observed in the instant case that the crossing was at the station, and the railway tracks were within the inclosure. The railway company was not required to keep a flagman at the crossing, nor to give any signs, signals, or other warnings of the approach of trains than such as were customary and usual in backing trains into the station yards.

There was no omission of duty in this respect, for, as found by all the courts, two men were on the platform of the leading

coach as "lookouts," and the whistle of the "monkey tail" was sounded at frequent intervals. Nothing more could have been done by the defendant to advise the plaintiff of the approach of the train except to have closed the gate.

The jurisprudence of this state is uniform to the effect that a pedestrian or a driver of a vehicle upon approaching railroad tracks and public railway crossings must, at his peril, stop, look, and listen before proceeding on the track or to make the crossing, and if he does not do so he is guilty of contributing to any injury which he may suffer, and cannot recover therefor.

In Callery v. Morgan's L. & T. R. Co., 139 La. 763, 72 So. 222, it was said:

"Because of the fact that a collision between a railroad train and an automobile endangers, not only those in the automobile, but also those on board the train, and also because the car is more readily controlled than a horse vehicle and can be left by the driver, if necessary, the law exacts from him a strict performance of the duty to stop, look, and listen before driving upon a railroad crossing, where the view is obstructed, and to do so at a time and place where stopping, looking, and listening will be effective."

The following cases are to the same effect: Perrin v. N. O. Terminal Co., 140 La. 818, 74 So. 160; Nolan v. Illinois Cent. R. Co., 145 La. 483, 82 So. 590.

In the case of Ladner v. N. O. Terminal Co., 139 La. 262, 71 So. 503, the court said:

"Plaintiff appeared to think that because of the failure of the defendant company to lower the gates, and he testified that it failed to lower them in this instance, he was relieved of all responsibility to look and listen while crossing the tracks of the defendant company. In this he was mistaken. He should have looked and listened while crossing a street in which cars are being operated in a city."

This rule has never been departed from in this state nor modified in any substantial respect.

It was not intended, and the court did not hold, in the case of Aymond v. Western

159 La.—12

Union Co., 151 La. 184, 91 So. 671, that a party before crossing a railroad track was not required to look and listen. What the court did say was that the obligation to stop must not be accepted so literally as to require a person upon approaching a railroad track to come at once to a position of absolute immobility.

"Common sense and common practice both indicate that it will suffice for such person to have his own motion so checked and under control that he may stop instantly if need be."

In the above case the record did not disclose whether the boy looked or listened, or whether looking or listening would have done any good; but since the burden of proving contributory negligence was on the defendant, "the presumption, in the absence of proof, was that the boy did look and listen, and that he gave some care to his own safety."

This court has never yet held directly or by reasonable inference that the failure of a railroad company to close the gates at public crossings and to keep them closed continuously in times of danger is of itself such a breach of duty and such an act of negligence as to constitute the immediate and proximate cause of an accident resulting in injury, and which would relieve the injured party from the duty of looking and listening or from exercising ordinary care and prudence to see for himself that there was no danger and that the route was sure and safe.

To hold so would be to make the railroad company an insurer against every accident happening at such crossings by collision with its trains when the gate was open, and that, too, without regard to whether the gate was left open intentionally, by accident, or through some defect in the appliances.

To establish such a rule of jurisprudence, as said by some learned authority, would be

"to make gates and flagmen harmful creators of negligence instead of helpful aids to safety."

Counsel for the plaintiff, in support of the contention that an open gate is an invitation to cross the track and a guarantee that the crossing is safe, rely on the cases of Taylor v. V. S. & P. Ry. Co., 123 La. 768, 49 So. 518; Roby v. Kansas City Ry. Co., 130 La. 880, 58 So. 696, 41 L. R. A. (N. S.) 355; Lincks v. I. C. R. R. Co., 143 La. 445, 78 So. 730; and Whittaker v. I. C. R. R. Co., 148 La. 319, 86 So. 825.

These cases do not establish the rule contended for, nor can they be accepted as precedents justifying the court in applying such a doctrine in the instant case.

In the Taylor Case, the plaintiff was killed by a train which moved over the crossing in front of him, and then backed up quickly and struck plaintiff as he was going across the tracks. The plaintiff saw the train as it passed over the crossing, and had no reason to think that it would return so soon. There was no question of the failure of the plaintiff to look and listen. The court said:

"It is probable that he had seen it when it passed. It is also very probable that he did not suspect that it would return immediately. He was a laborer from the country, and knew very little, as we understand, about the movement of cars and of trains."

It is also to be noted that in the Taylor Case the court said that the deceased had the right to attempt to cross, provided *he exercised ordinary care and prudence.* At crossings the right as between the train and the driver of a vehicle is about equal.

"If, while in danger, the deceased did that which an ordinarily prudent person would have done, the company is liable.

"There were precautions to be taken, in the absence of a flagman, which were not taken, such as moderation in the speed, and sending the lookout when near the approach, to make sure of the way."

An examination of the facts of the case will show that they are entirely different from the facts in the instant case, and do not justify the application of the doctrine contended for in this case.

In the Roby Case the party killed and those who were injured were in a hired car. The collision happened at a crossing in the city of Shreveport. There was an ordinance of the city which required that all locomotives and rolling stock should be preceded by a flagman, while crossing, and come to a full stop, before crossing certain streets. A flagman was required to be stationed day and night at certain named crossings, which included the crossing at which the accident occurred. The flagman at this crossing was not where he could be seen by the driver or the passengers in the car until the car was nearly on the track, when the flagman gave the signal to stop. The court found that if the flagman had not given the signal the car would have made it across the track in perfect safety. It was clear, therefore, that it was the fact of the untimely signal which precipitated the collision. It is true the court did say in the course of its opinion:

"That the chauffeur had the right to expect that, if there was any approaching train which threatened danger, the flagman would be out in front of the crossing with his red flag to warn him of it (just as, in places where they use 'gates' or bars which drop down across a street upon the approach of a train, persons using the street have the right to expect to see the bars in place if a train is approaching), and that the failure of the flagman to be there and give the warning was the negligence to which the accident must be attributed."

The court might very well have added in that case that the railway company was not only charged with the duty of keeping a flagman at the crossing, but likewise with the duty of bringing the train to a full stop before crossing, which, it appears, was not done in that case.

The fact is, however, that the court was

dealing with the question of the negligence of the railroad company as the efficient and proximate cause of the accident. The train was backing along the track and proper precautions were not taken to safeguard human life; no signal was given in such manner that the driver of the car could reasonably have apprehended danger in time to save himself from injury. There was no question of the failure of the driver of the car to stop, look, and listen involved in the case, and it is worthy of note that, coincident with the statement of the court that the chauffeur had the right to expect that if there was an approaching train which threatened danger the flagman would be out in front of the crossing with his red flag to warn him, the court found that there was no negligence on the part of the chauffeur which contributed to or was the proximate cause of the accident.

The other two cases cited arose out of the same accident, and there is nothing in them which could be construed as relieving one who attempts to cross a railroad track from the duty of exercising ordinary care and caution to secure his safety before going onto the track.

While the precise question presented in this case has not been heretofore passed on by this court, it has been the subject of consideration in many other jurisdictions, and the doctrine laid down almost universally is as stated by the Kentucky court—Kentucky & Indiana B. & R. R. Co. v. Singheiser, 115 S. W. 192. In that case the court said:

"The use by the company of the most approved safety appliances does not relieve one using the thoroughfare of the necessity of exercising ordinary care for his own safety in so using it, and it was the duty of appellee in approaching this crossing to exercise such care, and, while it may be said that when he observed that the gates were up that this was an invitation for him to cross, it was not an invitation to cross at all hazard, but only an invitation to cross with due care and regard for his own safety."

And in a New Jersey case, Lindsay v. Penn. R. R. Co., 78 N. J. Law, 704, 75 A. 912, the court said:

"The negligent conduct of the railroad company in not giving the statutory warning, or in not lowering gates at a crossing, does not absolve a person from the exercise of that due care and caution which is required from one going into a place of danger."

And in a Wisconsin case, Waterson v. Chicago, M. & St. P. Ry. Co., 164 Wis. 375, 160 N. W. 261, it was said:

"It is the duty of a traveller using a railroad crossing to look and listen at the last opportunity before entering the zone of danger, and the circumstance that gates are raised, which are customarily lowered when a train is about to pass, does not excuse failure to look and listen."

See, also, to the same effect: Fogg v. N. Y., etc., 223 Mass. 444, 111 N. E. 960 (a Massachusetts case); Headley v. D. & R. C. Co., 60 Colo. 500, 154 P. 731 (a Colorado case).

In the case of Koch v. Southern California R. R. Co., 148 Cal. 677, 84 P. 176, 4 L. R. A. (N. S.) 521, 113 Am. St. Rep. 332, 7 Ann. Cas. 795 (a California case), the court said:

"Nor is it the law that when a railroad company adopts safety gates or any other appliance for the protection of the public, the public is thereby absolved from all duty of taking care of itself. A person is still required to exercise due and ordinary care, and while the quantum of care which will be reasonable may be less where the gates are provided and are relied upon by the traveler, still the gates, themselves, are not an assurance and a warranty such as to justify a traveler in going blindly ahead in total disregard of all ordinary precautions, as did the plaintiff in this instance."

Numerous other cases from different jurisdictions might be cited to the same effect, but we do not deem it necessary to cite and to quote from them.

Our conclusion is that the failure of the plaintiff to look and listen, and to exercise such ordinary care and prudence as necessary to assure his safety before going upon

the railroad crossing, amounted to such contributory negligence as to bar his recovery for injuries to his person and to his automobile. The gate being located at a station crossing, and the railroad tracks being inclosed, the mere fact that the gate was open did not absolve the plaintiff from the exercise of that due care and caution which is required from one going into such a known place of hazard and danger.

For the reasons assigned, the judgment of the Court of Appeal herein made the subject of review is affirmed, at plaintiff's costs.

ROGERS, J., dissents and hands down reasons.

ST. PAUL, J., concurs in the dissenting opinion.

ROGERS, J. (dissenting). I agree in the conclusion reached by the district judge that the defendant company was negligent in having failed to close the gate while backing one of its trains across the public street into the railroad station. The open gate was notice to plaintiff that there was no danger in passing through it, and it was an invitation to him to proceed on his way. When plaintiff reached Basin street and found the gate open, he was only required to look out for the right of way traffic coming from the direction of Canal street. It was not incumbent upon him at the same time to look out for the approach, behind the iron fence and towards the open gateway, of the trains of the defendant company. Plaintiff was entitled to rely upon the performance by the defendant company of its plain duty under its franchise from the municipality to keep the gate closed when trains are entering or departing from the depot, and to keep it open when the conditions are otherwise. If the principle announced in the majority opinion be correct, the requirement of the municipality was a mere empty gesture, the erection of the gate was unnecessary, and its further operation is superfluous. It becomes a menace rather than a protection to the public. If the gate was lacking and the street was open, a greater degree of safety would be provided for the public than under the present conditions, because, in that event, in passing through the depot along the street in question, they would necessarily be reminded of the duty to stop, look, and listen before crossing the railroad tracks. I think the plaintiff is entitled to a recovery, and for that reason I respectfully dissent from the opinion and the decree.