HIRSCH v. L. R. & N. CO.

(February 11, 1929. Opinion and Decree.)

H. W. Robinson, of New Orleans, attorney for plaintiff, appellee.

Milling, Godchaux, Saal and Milling, of New Orleans, attorneys for defendant, appellant.

JONES, J. This suit was filed in June, 1924, for $2,045.50, as damages for a sprained ankle suffered in an accident which occurred on July 17, 1923.

Plaintiff alleges as follows:

On the evening of July 17, 1923, she was riding in an automobile driven by her son-in-law on the New Basin Shell Road, going toward Carrollton Avenue from West End, approaching the point at which the track of the Louisiana Railway & Navigation Company crosses the Shell Road and the New Basin Canal, where defendant maintains gates to warn travelers of the approach of trains. Articles V and VIII of the petition read as follows:

"That, as the said automobile reached the tracks of defendant, the gates were up, thereby indicating that it was safe to proceed; that, relying upon said signal, the operator of the automobile in which petitioner was riding proceeded to cross the tracks of defendant; that, as said automobile was on the tracks of defendant, a train of defendant was seen by the occupants of said automobile and petitioner coming upon the said automobile at a great rate of speed; and that all of the occupants of the said automobile, including petitioner, realizing that something was wrong, became frightened and terrified, and jumped out of the said automobile."

"That defendant is liable for the said accident in that it not only failed to give the driver of the automobile in which petitioner was riding notice or warning that a train was about to cross immediately in front of the said automobile, but defendant actually invited the driver of the said automobile to proceed by having the gates, at that point, up; that defendant's said neglect was the direct and proximate cause of petitioner having become frightened and jumping from the said automobile as aforesaid and defendant is therefore liable for the injury which she sustained."

Defendant, after denying negligence, and averring due care in operating its train and the injury, if any, as caused by plaintiff's negligence, in Paragraph IV, made the following statements:

"In answer to paragraph 4 of the plaintiff's petition, defendant admits that, where its tracks cross the West End Roadway, it maintains gates, which are sometimes used for the purpose of warning travelers of approaching trains, and also that when said gates are down, such fact is an indication to the traveling public that a train is approaching, but defendant denies that when said gates are up, that fact is an indication to the public that no train is approaching, because your defendant maintains other signalling devices at the said crossing, which are also used for the purpose of warning travelers of the approaching of its trains, and it further maintains a watchman at the said crossing and the bridge over the New Basin Canal, which said watchman operates signals, flashes such lanterns, waves such flags, etc., as the particular situation demands. Except as herein expressly admitted, defendant denies the allegations of paragraph 4 of plaintiff's petition."

The case was tried on March 20th and 21st, 1928, almost five years after the accident, and there was judgment in favor of the plaintiff in the sum of $545.00, with interest and costs, from which judgment defendant has appealed.

The evidence shows that the accident occurred on July 17, 1923, about 9:30 p. m., on a warm, dry night; that the road along the New Basin Canal was not paved, but was a shell road sufficiently wide to accommodate two parallel lines of automobiles. The track of the defendant crosses the shell road and the New Basin Canal at a forty-five degree angle about three hundred yards from the point at which Carrollton Avenue crosses the New Basin Canal, and at that point traffic was frequently greatly congested.

Defendant's track extends in a straight line from the New Basin Canal for about a half mile and then makes a curve towards the Seventeenth Street Canal, which forms the boundary line of Jefferson Parish and is at least three-fourths of a mile from the point at which the accident hap-

pened. At the time there were no houses along the track, and one driving an automobile along the New Basin Canal Road toward Carrollton Avenue had a clear view for at least half a mile. Defendant has a bridge over the New Basin Canal, with a bridge house in the center, which is about one hundred and twenty feet from this crossing. In this bridge house defendant keeps a bridge tender, who operates the crossing gates and the electric crossing bells.

At the time of the accident plaintiff was a guest in a five-passenger open car which was being driven by her son-in-law, Masson. On the front seat, with the driver, sat his wife, Mrs. Masson, plaintiff's daughter, and on the rear seat were plaintiff, her sister, Mrs. Mebyovich, and three children, the plaintiff sitting on the left hand side toward the New Basin Canal, just behind the driver of the car. On account of the congestion at Carrollton Avenue and the Shell Road, where a traffic policeman was located, Masson's car was caught in a solid line of traffic extending for three or four blocks on both sides of the railway crossing. This line moved only a few feet at a time, and when the accident happened, Masson's automobile was directly across the track of the defendant company—unable to move either forward or backward on account of the congestion.

Masson testified that he did not look for trains before going on the track, but after he was stopped on the track he heard the crossing bell ring and got out of the car, when he saw the train about a block away, coming from the direction of Jefferson Parish. He then shoved the automobile off the track with the assistance of some other men, as the bridge tender had by that time made the other cars in front of him move up closer together. The train then passed behind his automobile about ten miles an hour.

Mrs. Masson testified that a few moments after the automobile stopped on the track the crossing bell began to ring, but *they did not get out right away as they did not think it necessary*, but after the bell had rung for half a minute they got out; they did not see the train until they got out of the car, when the train was about half a block away. Neither she nor her husband remembers seeing any light on the train, which backed up with a box car on the end nearest the canal.

Plaintiff herself testified that the automobile first stopped about ten feet from the track, at which time she looked towards Jefferson Parish and saw nothing; that after the automobile had been on the track three or four minutes, the crossing bell began to ring, when she looked again and saw a red reflection. Then she jumped out of the car hurriedly, being greatly frightened because she had a baby on her arm. She then placed her foot on a stone or piece of cross-wood in the road which was paved with shells at the time, and it turned over, spraining her ankle and causing her to fall. She confirms her son-in-law as to the automobile being shoved off the track.

On cross-examination she testified that the light she saw was a red reflection and that when she heard the gong ring, she hollered "we might as well jump for our lives." She did not know how long it took to get the car off the track, or how soon the train passed, as she was suffering too much to notice, but she thought it was probably ten or fifteen minutes; that it was always her custom to look up and down before crossing a railroad track. She does not complain of lack of light in the road, and there must have been sufficient light,

as all the automobiles were presumably lighted.

Her sister testified that she looked to the right and left as they approached the track, but saw nothing, and after they stopped on it they saw the train coming about a block and a half away, with a red light burning on the end of the box car next them; the automobile remained on the track three or four minutes before it was rolled off. When they saw the train, all hollered and Mrs. Schnetzer, who had a baby on her arm, wanted to jump out.

Roggenkamp, who was not employed by the company, testified that a red fusee was burning on the end box car of the train next the road.

Alexander, the bridge tender, who had been working in that position for defendant more than five years, testified that it was his duty to operate the bridge and gate from the tower about ten feet above the bridge, and protect the crossing; that on the evening in question he had observed the heavy traffic on the road carefully, as he was expecting this train about 9:30, the usual hour at which it crossed; as soon as he saw from the tower the red reflection about three-fourths of a mile away, he sounded the warning bell, but did not lower his gates, as it was impossible to do so without striking an automobile; that he then took his lantern and walked over to the road to clear the traffic and signal the approaching train, if necessary; when he reached the crossing, which was only one hundred and twenty feet away, plaintiff had already jumped out of the automobile; under no circumstances would the train have proceeded to cross the road until he had given the signal that the crossing was clear; the purpose of the electric gong, which was placed at the right side of the road between the road and the car-track, was to warn traffic of the approach of a train; the train was more than a half-mile away, around the curve, when he first sounded the gong that night; he received the usual signal from the engineer—four whistles—but did not give any signal to come ahead with his lantern until the track was clear, and the train was at least four or five hundred feet away when he finally gave the signal to proceed.

J. R. Welsh and H. N. Welsh testified that they were riding on top of the lead box car; that each had a white lantern in his hand and that a red fusee (like a roman candle) was burning at the end of the car next to the canal; that it was their duty to transmit by lanterns the signals received from the bridge tender at the crossing, to the engineer, by relaying the same to Gernon, another member of the crew, whose position was on the top of the box car next to the engineer, and then Gernon would in turn transfer by lantern the signal to Roggenkamp, the engineer.

All of the above named testify that the train was being operated that evening in the usual prudent manner; that it crossed the Seventeenth Street Canal going about six or eight miles an hour, and that, as they crossed canal, the engineer blew four blasts of the whistle to warn the bridge tender of his approach; they did not receive any signal from the bridge tender and, accordingly, they slowed down until they were barely moving; that finally, when they were within a few hundred feet from the crossing, they received the signal from the bridge tender and then the train continued over the road; the train consisted of twenty-five or thirty box cars, some loaded and some empty, which had been collected in the yards in Jefferson Parish and were being brought

into the city to be left at warehouses and terminals.

Graham, Superintendent of Terminals of the defendant company, testified as to the rules of the company then in force, and also as to the yard limits which he said began at mile post 298.36, New Orleans, about a half-mile from Jefferson Highway that runs up to Shrewsbury; that the regular signal in approaching a crossing or bridge was four blasts of a whistle and that there was no rule requiring that the gates of the crossing be always lowered.

The above analysis of the evidence shows that the train was at least one-half a mile away when the bell began to ring and that it slowed down almost to a stop at least four or five hundred feet from the crossing and that there never was any danger of a collision, as the engineer could not proceed until the bridge tender gave the signal, which he would not do until the crossing was clear. It further shows that plaintiff's sister was mistaken in thinking that she saw the train one and one-half blocks away, while the auto was on the track, and that plaintiff, who was sitting on the left hand of car, was mistaken in thinking the train so near, as stern car was then one-half mile away.

In his petition plaintiff makes two charges of negligence:

First: That defendant failed to warn the chauffeur that a train was about to cross in front of him, and

Second: That defendant invited plaintiff upon the tracks by having the gates up.

The evidence shows that the first charge is unsupported because defendant did give ample warning that the train was approaching and that it took all the usual precautions to clear the track before it permitted the train to come over.

In answer to the second charge, we quote from Gibbens vs. N. O. Terminal Co., 159 La. 347, 105 So. 367, in which the Supreme Court said:

"This court has never yet held directly or by reasonable inference that the failure of a railroad company to close the gates at public crossings and to keep them closed continuously in times of danger is of itself such a breach of duty and such an act of negligence as to constitute the immediate and proximate cause of an accident resulting in injury, and which would relieve the injured party from the duty of looking and listening or from exercising ordinary care and prudence to see for himself that there was no danger and that the route was sure and safe.

"To hold so would be to make the railroad company an insurer against every accident happening at such crossings by collision with its trains when the gate was open, and that, too, without regard to whether the gate was left open intentionally, by accident, or through some defect in the appliances.

"To establish such a rule of jurisprudence, as said by some learned authority, would be 'to make gates and flagmen harmful creators of negligence instead of helpful aids to safety.' "

During the trial defendant's superintendent, under cross-examination, read two rules from the current book of rules as follows:

"When the cars are pushed by an engine, except when shifting or making up trains in yards, a white light must be displayed on the front of the leading car by night.

"You will send a man ahead to flag street cars and wagons before proceeding over the following crossings in New Orleans Terminal, at Shell Road, Carrollton Avenue, Hagan Avenue, Broad Street, Galvez Street, Claiborne Avenue and Magnolia Street. This is very important and these instructions shall be lived up to the letter."

When plaintiff's attorney asked the bridge tender if he had any orders not to lower the gates when traffic was heavy, he answered:

"No. But there is no chance to lower these gates when traffic is close to one another."

Plaintiff contends that failure to obey these two rules constituted additional negligence to that charged in the petition. This argument is untenable because the evidence shows that each of the trainmen on the end of the approaching box car had a white lantern, and that the red fusee attached in the same place, (described as being like a Roman candle), gave a sufficient reflection to be seen at least half a mile away, and there is no evidence to show that a white light would have done any better or even as well. Furthermore, as the bridge tender went down on the road and cleared the traffic before he allowed the train to cross, the second rule was substantially obeyed.

The operation of the railroad facilities has to fit in with use by the public of this Shell Road. The public is entitled to use it and the defendant would not be justified in lowering the gates an hour before a train was expected. At what moment, then, does prudent conduct on the part of the defendant, considering the circumstances, considering that the street crossing should not be obstructed by the railroad company any longer than is necessary, require this towerman to turn on his electric bell, and if possible, to lower the gates? The towerman certainly was not justified in doing either of these things until he had the first warning of the approach of the train. His testimony shows that he was expecting the train, that the moment he saw the reflection of the light on the head end of the train, then about three-quarters of a mile away, he turned on the electric bell

to warn traffic of the approach of the train. Up to that he certainly was not required to prevent automobiles from running over the track. It happened that the plaintiff's automobile was on the track at the first moment that this towerman was justified in starting the warning bell. At that moment, if the towerman had lowered the gates, he would have trapped the plaintiff's automobile upon the crossing.

As plaintiff's daughter, sitting on the front seat, testifies that she *did not think it necessary to get out of the automobile right away* as soon as the gong sounded, we conclude that plaintiff became unnecessarily alarmed and, in her nervous fright, jumped out on rough ground when she could have alighted with safety. Apparently she concluded the gong meant immediate approach of train, whereas it meant to clear the tracks and get ready for the train to cross. On this point see Laborde vs. La. Railway & Navigation Co., 121 La. 47, 46 So. 97, in which the Court said:

"In this case, as no such collision occurred, the injuries received by the plaintiff are not chargeable to the neglect to whistle. The injuries received by the plaintiff were the result of a woman apparently of nervous organization, thrown into a situation to which she was not accustomed, losing her nerve and becoming unnecessarily alarmed as to what the horses she was driving might do, and led on the strength of apprehensions which were not warranted into doing an act which resulted in personal injury to herself. We think it fairly appears from the evidence that, if the plaintiff had remained in the buggy and retained the reins in her hands, the horses could have been easily controlled.

"The defendant company cannot be made to respond in damages for plaintiffs' belief that such was not the fact, no matter how honest she may have been in her opinion on that subject. It may be well to say that nothing occurred on defendant's train, while passing along its track in rear of the

buggy, which would give to its passage any exceptional feature."

In the case of Chretien vs. N. O. Railways Co., 113 La. 761, 37 So. 716, 104 Am. St. Rep. 519, plaintiff's son was a passenger on one of the electric cars of defendant company, when a broken wire fell just before day, striking the dashboard of the car. Although the lights went out, and there was an explosion, neither the car nor any passenger was injured except plaintiff's son, who, while standing near the open door at the rear, jumped from the car and fractured his skull. In confirming a decision for the defendant, the Supreme Court quotes with approval from South Covington & C. St. Ry. Co. vs. Ware, 84 Ky. 270, 1 S. W. 493, as follows:

"The character of the impending danger, or at least its apparent character, is to be considered. If one acts unreasonably, rashly, or becomes frightened at a trivial occurrence not calculated to alarm a reasonably prudent man, and thereby brings injury upon himself, there is no liability. * * * It is urged that when one is frightened by something resulting from the neglect of the carrier he cannot be charged with contributory neglect to any extent. He, however, must act upon reasonable apprehension of peril. His conduct must conform to that of an ordinarily careful man under like circumstances. He has no right, upon the happening of some trivial occurrence, or such as would not create fear or apprehension of injury in the mind of an ordinarily prudent and careful person, to bring injury upon himself, and then recover damages by reason of it."

The principle of law that where a railroad company acts in the usual and customary manner, its action is not negligent, was stated by the Supreme Court, in the case of Spizale vs. Louisiana Railway & Navigation Company, 125 La. 190, 54 So. 715, where the Court said:

"The negligence charged against the defendant company is that the bell was not rung before the locomotive moved, nor the whistle sounded; that a proper lookout was not kept; and that this little ditch, or drain, was left uncovered.

"The evidence shows that it was not customary to ring the bell or sound the whistle upon this yard while switching, except in passing the street crossings; the not doing so on this particular occasion was therefore not negligence."

Although the situation was unusual in the instant case, on account of the very heavy traffic at this crossing, plaintiff has failed to prove defendant guilty of negligence, and the suit must therefore be dismissed.

It is therefore ordered, adjudged and decreed that plaintiff's suit be dismissed.