HIGGINS, J.
These are two suits instituted by a husband and wife for damages for personal injuries and property damage arising out of an accident at the intersection of St. Louis street and North Carroll-ton avenue in the city of New Orleans on May 24, 1927, at about 9 o’clock p. m. Defendant denied liability and specially pleaded contributory negligence. There was a verdict and judgment in favor of the husband for the sum of $250 and in favor of the wife for the sum of $1,500. Plaintiffs appealed, and thereafter defendant appealed.
North Carrollton avenue is a very wide street, with a neutral ground in the center, and paved roadways on each side of it, and extends or runs from uptown to downtown. This avenue intersects St. Louis street, which is occupied by thirteen tracks of the defendant company that measure, *582 from outer rail to outer rail, 180 feet. These tracks are protected by two gates and the width or distance between them is 260 feet. Traffic moving on North Carrollton avenue below Canal street uses the river side of the avenue, and traffic moving from the direction of Esplanade avenue towards Canal street on North Carrollton avenue uses the lake side of the thoroughfare. St. Louis street runs from the direction of the river towards the lake and intersects North Carrollton avenue at a right angle. The traffic gates which protect the railway company’s tracks consist of a long wooden arm, from which is suspended a red light, and is controlled and operated by air pressure by a flagman, who is stationed in a tower located among the tracks, and so situated that he is in position to see the trains and traffic traveling on St. Louis street and North Carrollton avenue. The to.wer referred to is 20 feet above the ground. There is one gate on the river side of Carrollton avenue protecting the traffic proceeding on Carrollton avenue from Canal street to Esplanade avenue, and another gate on the lake side of Carroll-ton avenue protecting traffic moving on North Carrollton avenue from the direction of Esplanade avenue towards Canal street. The last or thirteenth track towards Esplanade avenue is the north or outbound main line, and the twelfth track is the south or inbound main line track. There is a coal chute 35 feet square and 40 feet in height situated in the middle of the tracks about 200 feet from the crossing towards the river on St. Louis street. One block from the intersection in the direction of the river is also located the company’s roundhouse, occupying more than a half square. There is also a carpenter’s house 50 feet from the roundhouse that measures 50 by 75 feet, and also an oil house in the same block, 60 feet by 150 feet. The oil house and carpenter shop are located where the tracks are, near the corner of Scott street, on the Canal street side, about a block in the direction of the river from the intersection where the accident occurred. The coal chute is 50 feet from the northbound main line toward Canal street. The carpenter shop and the oil house are 150 feet from it. The streets, going in the direction of the river from North Carroll-ton avenue, that cross St. Louis street and the tracks of the defendant company, are, first, Scott street, and, second, Cortez street. The eleven tracks adjacent to the two main line tracks are located on the Canal street side thereof on St. Louis street, and there is considerable switching done on these tracks between North Carrollton avenue, Scott and Cortez streets. The crossing is illuminated by the city lights, but towards the river and lake on St. Louis street it is very dark.
On the night in question, Mrs. McLellan, one of the plaintiffs, was driving her five-passenger Franklin sedan on the river side roadway of North Carrollton avenue, with her husband seated on the right-hand side of the front seat of the car. When she reached the intersection of St. Louis street and the railroad tracks, due to the fact that there was an engine about to pass, the flagman in the tower lowered the gates so as to protect traffic from the engine. There were four or five automobiles which also stopped where plaintiffs’ car was standing due to the gate being down. As the engine passed, the gate, together with the red light suspended from it, lifted and plaintiffs proceeded in the lead to go over the- tracks. As their car reached the thirteenth or last track, which is the north or outbound track, it was struck on the right rear side by a passenger train consisting of an engine, a day coach, and two private cars. This train was proceeding north or towards the lake on the thirteenth or north *583 bound track and was in charge of an engineer, fireman, conductor, and flagman. The automobile was going about ten or fifteen miles an hours and the train about ten. As a result of the collision the automobile was knocked some 40 feet in the direction of the neutral ground toward Esplanade avenue on North Carrollton avenue and overturned twice. A bystander and some neighbors rescued plaintiffs from the automobile and after administering first aid treatment sent them to Charity Hospital.
In this court the defendant concedes that its employees were guilty of negligence, but contends, first, that the plaintiffs were guilty of contributory negligence, and, second, that the defendant’s employees did not have the last clear chance.
We will first take up the question of whether or not the plaintiffs were guilty of contributory negligence.
In Cherry vs. Louisiana & A. Ry. Co., 121 La. 471, 46 So. 596, 17 L. R. A. (N. S.) 505, 126 Am. St. Rep. 323, it was said:
“Where the distance across four railroad tracks is only 49 feet, a traveler about to cross the tracks exercises all due legal care and prudence if he stops and looks and listens before venturing upon the first track. He is not required to repeat the precaution with each of the tracks in succession.
“One who, on a public highway, approaches a railroad track, and can neither hear nor see any indication of a moving train, is not chargeable with negligence in assuming that there is none sufficiently near to make the crossing dangerous.”
See, also, Seelhorst vs. Pontchartrain R. R. Co., 11 La. App. 586, 123 So. 626.
In Strotjost vs. St. Louis Merchants’ Bridge Terminal R. Co. (1916) a Missouri case (App.) 181 S. W. 1082, it was held that one on the highway may regard the raising of the gates as an invitation to him to pass forward in safety.
In Pulcino vs. Long Island R. Co., 125 App. Div. 629, 109 N. Y. S. 1076, affirmed in 194 N. Y. 526, 87 N. E. 1126, it was held that it was for the jury to say whether the gates were raised enough to warrant the deceased in believing that the raising of them was a declaration to him that the way was safe and to go ahead, and to what extent his vigilance was thereby lessened. This was a case where the gates were only partly raised.
In Chicago & E. I. R. Co. vs. Schmitz, 211 Ill. 446, 71 N. E. 1050, it was held that the raising of -gates after the passage of a train was an invitation to the traveler to cross, and whether she was justified in doing so, and whether she took proper pains to look to see if any train was coming, were questions of fact for the jury.
As further authority for the acceptance of the lifting of the gates as an invitation to cross, we quote from 33 Cyc. Railroads, p. 1028:
“Where a railroad company maintains a flagman, gates or other signals or warnings at a railroad crossing whether voluntarily, or by law or custom, the public generally has a right to presume that these safeguards will be reasonably maintained and attended, and in the absence of knowledge to the contrary, the fact that the gates are open, or automatic bells not ringing, or that the flagman is absent from his post, or if present is not giving warning of danger, is an assurance of safety and an implied invitation to cross upon which a traveler familiar with the crossing may rely and act within reasonable limits, on the presumption that it is safe for him to go on the crossing. The extent to which a traveler may rely on such assurance is a question of fact, and while ordinarily the same degree of care and vigilance is not required of a traveler under such circum *584 stances as otherwise, he has no right to rely exclusively upon such circumstances, nor will such presumption or assurance excuse the traveler from using every reasonable precaution that an ordinarily prudent man would use under like circumstances. * * *”
Prom the same volume of Cyc., page 946, we quote, “Duty of Railroads as to Management of Gates”:
“* * * The public have a right, when the gates are open, or the flagman not in his accustomed place of duty, to presume, in the absence of knowledge to the contrary, that the gateman or flagman is properly discharging his duties, and it is negligence for a gatekeeper or flagman to leave his post, knowing that an engine is approaching, without giving some signal of danger. If the flagman or watchman neglects to give any warning, or does not give a warning until the traveler is in great danger, especially where the view of the approaching train is obstructed, and no signals are given by it, the railroad company is responsible. Where gates are established, although there is no statute requiring their maintenance, it is negligence if they are not constructed, attended, and maintained, with ordinary care and prudence, so as to give the proper warning of an approaching train, or so as not to injure a passerby by the manner in which they are maintained or closed.
The defendant points out, in support of this plea, that the view of the plaintiffs was unobstructed when the automobile was about 50 feet from the thirteenth or northbound track in the direction from which the train came, as the testimony of its witnesses show that the main line track is straight for a distance of about three blocks in the direction of the river. However, it is conceded by the defendant that, at the point where the plaintiffs’ automobile stopped before going on the tracks, prior to the raising of the gate, the coal chute obstruction made it impossible for the plaintiffs to see the train approaching on the last track. Defendant further concedes that the evidence is conflicting as to whether or not the bell and whistle signals were given by the train and that the evidence on that issue does not preponderate in favor of the defendant. Defendant also concedes that the burden of proving by a preponderance of the evidence that plaintiffs are guilty of contributory negligence is upon itself. In its last analysis the contention of the defendant is that, as the plaintiffs’ view of the approaching train was unobstructed when within about 50 feet of the track, and as the electric headlight on the engine was burning, that this was sufficient warning to place the plaintiffs on their guard of the impending danger of the approaching train, and that, in failing to observe the train, they were guilty of contributory negligence. Defendant cites a long list of authorities in support of this contention to the effect that the driver of an automobile must stop, look, and listen at a point where such action on his part would be effective in preventing the accident.
The evidence convinces us that, as the gates lifted, Mrs. McLellan, the driver of the automobile, proceeded to cross the tracks at a careful and moderate rate of speed with the other four or five automobiles, but in advance of them. She was required, under the circumstances, in order to carefully drive, to keep a lookout to the left, where trains might approach and where the other automobiles were moving in the same direction that she was driving and had a right to pass her car on that side. She also had to look forward or ahead, where she was going, as well as to the right of her, where trains might approach. She had to keep under observation thirteen tracks on her right and left, and could not look in these respective directions simultaneously. Both Mrs. McLellan and *585 her husband testify that they did look to the right but saw no approaching train due to their view being obstructed by the coal chute. It is admitted that she had to be within 50 feet of the thirteenth track in order to obtain an unobstructed view towards her right, the direction from which the train came. If, at that moment, she was looking to the left, or straight ahead, where it was likewise her duty to also look, and failed to observe the train, which was approaching from the right, we cannot say she was not maintaining a proper lookout as an ordinary prudent and careful driver would have done under the circumstances, because she was invited to go upon the tracks by the raising of the traffic gate, a signal that there were no trains approaching. The signal relieved her of the necessity of extraordinary vigilance and care. She was proceeding at a careful rate of speed and drove her car as any ordinary, prudent person would have done under the same circumstances.
The flagman stationed in the tower, a witness for defendant, testified that trains were switching that night at 9 o’clock in the squares between Cortez and Scott streets and Scott and Carrollton avenue, and that there were freight trains on the tracks which were not used as the main line tracks, and that there were two or three of them switching in this area; that there were some box cars on these tracks, but he could not say how many were on the side tracks in those squares at the time, but that there were some there. It may well be that some of the box cars on the other tracks prevented the plaintiffs from seeing the passenger train approaching.
We are convinced that the plaintiffs’ view of the oncoming train was obstructed and that they did not see the train until it was upon them, because the flagman in the tower testifies that he did not observe the approaching train until it was within 50 feet of the crossing. Under the circumstances we are of the opinion that the plaintiffs were not guilty of contributory negligence.
We do not consider the cases of Gibbens vs. N. O. Terminal Co., 159 La. 347, 105 So. 367, and Ladner vs. N. O. Terminal Co., 139 La. 262, 71 So. 503, which able counsel for defendant have cited, as applicable, because we find from the evidence that the plaintiffs did stop, look, and listen and exercise such ordinary care and prudence required of them under the circumstances.
As to the quantum of damages, the evidence shows that the automobile was struck and knocked about 40 feet, overturned twice, and was demolished; that it was three and a half years old, having a trade-in value of twelve or thirteen hundred dollars; that it was so badly broken and smashed that the wreckage was traded in for $150.
Mr. McLellan suffered multiple contusions and bruises over the head, body and legs, and testified;
“I do not think I have any place that would measure twelve inches that was not damaged. At the present time this foot (indicating his left knee) bothers me. It is very weak.”
He further testifies that he was 77 years of age and in good physical condition before the accident, and that he still suffers headaches from the blows he received on his head; that his memory is poor as a result of the injuries received; and that before the accident he was able to go up and down stairs unassisted, but presently is unable to do so without assistance. Dr. Lucien Landry, who examined him on May 27, 1927, corroborates Mr. McLellan’s testimony as to subjective pains as follows:
*586 “Pain in the right shoulder, arm and hand, pain in left chest from mid-sternal line to axillary region. That is under the arm right back to the scapular or shoulder blade. So much so that he is unable to lie on the right side. Has a headache all the time and experiences considerable vertigo when he stoops, has pain in right ankle and heel radiating towards the toe. Pain in right muscles of the neck, posterior. That is the right side of the back part of the neck. We found a new scar on the dorsal surface of the right hand near the thumb. That is the result of a lacerated wound; * * * a decided impediment in walking. He walked with difficulty. I tried him on the steps and he was very hesitant in negotiating the stairway and that he was in a very nervous state, which could be attributable to the accident or to his advanced age.”
This doctor only saw the plaintiffs on one occasion.
Dr. G. A. Jung treated Mr. McLellan at his home on May 6, 1927, and described his injuries as follows:
“Mr. McLellan had general contusions, first of the middle third of right arm and hand; second, lower part of left leg and foot; third, right foot at heel; fourth, right chest; fifth; his head.”
The doctor further testified that Mr. Mc-Lellan was extremely nervous and had a tremor, which, in his opinion, resulted from shock; that he saw the patient off and on for possibly three months; that he was confined some time to bed and other times he was around the place. Mr. McLellan also claimed $12 for the cost of a violet-ray machine, which the doctor recommended that he use, medicine $11.20 and one of the doctors’ bill $38, a total of $61.20. The patient was also treated by Dr. Nelson for stomach trouble, but we do not believe this ailment was sufficiently connected with the accident. The medical testimony also convinces us that some of his ailments are due to his advanced age and not to the accident. The jury allowed a sum of $250. We regard this as inadequate and believe that the damages for personal injuries should be increased to $500, plus $61.20 for the above-enumerated items.
Mrs. McLellan was also treated by Dr. G. A. Jung and testified that this examination -on May 6, 1927, revealed the following:
“* * * Mrs. McLellan had contusions of the first middle left thigh; second, left leg below knee; third, left chest; fourth, left arm at elbow; fifth, right thigh, middle third; sixth, right hand, palmer surface; seventh, along sympysis pubis; eighth, about the head.”
He further testified that Mrs. McLellan was nervous and upset and suffered from acid burns on the right shoulder and left shoulder, on her left side and left chest, and had severe bruises on the upper third of the leg; that he applied heat first and then medicine towards relieving the pain and used the ultra violet rays to reduce contusions; that he used bromide as a sedative and on one occasion codine to relieve the pain; that he treated her possibly for the same period of three months that he treated Mr. McLellan; that she was confined to her bed in her home for a like period of time, being sometimes in bed and sometimes just around the place; that her nervous condition at the time was due to the shock, but that her injuries were not permanent. Dr. Landry’s testimony is corroborative.
Mrs. McLellan also sued for the cost of the Franklin sedan, her separate property, which cost $3,350 new and was about three and a half years old and had a trade-in value at the time it was wrecked of twelve or thirteen hundred dollars. This was testified to by the representative of the *587 agency that sold her the car. The wrecked car was traded in for the sum of $150 on a new Franklin automobile. The jury allowed Mrs. McLellan the sum of $1,500 for injuries and property damage. Assuming that the trade-in value of the car would be $1,250 and the wreckage brought $150, Mrs. McLellan’s net loss on the automobile would be $1,100. The jury, therefore, only allowed her $400 for her personal injuries and suffering. Mrs. McLellan was confined to the hospital for two nights and a day and a half, and the evidence shows, as well as her testimony, that she suffered multiple bruises and contusions of the body and that the sulphuric acid from the automobile battery burned her on the shoulders, chest, lower part of her body, and upper part of her thighs. It is not suggested that Mrs. McLellan’s ailments were in any way the result of her advanced age, as in the case of her husband. While her age is not given, it appears she is much younger and was in better physical condition before the accident than her husband. She was more severely and painfully injured than he was.
Under the circumstances, we believe that she was entitled to the sum of $1,000 for personal injuries and suffering and $1,100 for the loss of her automobile, or a total of $2,100.
For the reasons assigned, the judgment of the lower court is amended by increasing the award in favor of Orris J. McLellan to the sum of $561.20 and the award in favor of Mrs. Emma Gueringer, wife of Orris J. McLellan, to the sum of $2,100, with legal interest from judicial demand until paid, and as thus amended the judgment of the district court is affirmed, defendant to pay all costs.